823 F.2d 1457
 23 Fed. R. Evid. Serv. 1000
 UNITED STATES of America, Plaintiff-Appellee,
v.
Dennis McLAIN, a/k/a "Del Brenner," a/k/a "Dennis Hogan,"
Seymour Sher, a/k/a "Bruce," a/k/a "Sy,"
Defendants-Appellants.
 No. 85-3399.
 United States Court of Appeals,
Eleventh Circuit.
 Aug. 7, 1987.
 
 Arnold D. Levine, Tampa, Fla., for McLain.
 Thomas J. Nolan, Finley, Kumble, Wagner, Heine, Underberg, Manley & Casey, Beverly Hills, Cal., Jeffrey M. Smith, Arnall, Golden & Gregory, Randy Evans, Jeffrey Bogart, Atlanta, Ga., for Fisher.
 Lee Atkinson, Asst. U.S. Atty., Lynn Cole, J. Kirk Brandfass, Tampa, Fla., Ernst D. Mueller, Asst. U.S. Atty., Jacksonville, Fla., Joel Gershowitz, Crim. Div., U.S. Dept. of Justice, Washington, D.C., for plaintiff-appellee.
 Appeal from the United States District Court for the Middle District of Florida.
 Before FAY and KRAVITCH, Circuit Judges, and MORGAN, Senior Circuit judge.
 MORGAN, Senior Circuit Judge:
 
 
 1
 Appellants Dennis McLain and Seymour Sher were convicted by jury trial in the United States District Court for the Middle District of Florida of violating the federal RICO statute 18 U.S.C. Sec. 1962(c), conspiring to commit that offense in violation of 18 U.S.C. Sec. 1962(d); and using extortionate means to collect an extension of credit, in violation of 18 U.S.C. Sec. 894. McLain was also convicted of possessing cocaine with intent to distribute, in violation of 21 U.S.C. Sec. 841(a)(1). Both appellants contend that the trial schedule imposed by the district court and the prosecutor's misconduct denied them a fair trial. Each appellant also raises a number of errors on procedural grounds. Although not every claim is meritorious, we agree with the appellants that they did not receive a fair trial. Therefore, we reverse and remand this case to the district court.
 
 I. FACTUAL BACKGROUND
 
 2
 In March 1984, Dennis McLain and Seymour Sher, along with Barry Nelson, Larry Knott, Jose Rodriguez, Frank Cocchiaro, and Mel Kaplan, were indicted for various offenses, ranging from racketeering, to extortion, to importing and distributing cocaine. After a mistrial,[1] a second trial began on November 26, 1984, lasting four months. Eventually, Sher was convicted of loansharking in violation of the federal RICO statute 18 U.S.C. Sec. 1962(d), conspiring to violate said statute, and of extortion in violation of 18 U.S.C. Sec. 894. He was sentenced to three concurrent twenty-year terms. Cocchiaro was convicted of the racketeering, conspiracy, and extortion counts and also received three concurrent twenty-year terms. McLain was also convicted of these offenses plus the offense of possessing cocaine with intent to distribute. He received concurrent eight-year terms for the first three counts and a fifteen-year sentence for the drug charge. Kaplan, Nelson and Knott pled guilty to the cocaine charge[2] and received lesser sentences. Finally, Rodriguez was acquitted along with McLain of conspiring to import cocaine.
 
 
 3
 At trial, the government introduced evidence to prove that the criminal racketeering charges originated in the offices of First Fidelity Financial Services in Hollywood, Florida. The government argued that Cocchiaro, Sher, and Nelson used these offices as a front for their loansharking activities. McLain ran a First Fidelity office in Tampa, Florida, and was also involved in these activities. These defendants allegedly made loans up to $40,000 and charged usurious interest rates (up to 130%). They also allegedly received large kickbacks for processing several loans. The government claimed that these offices were also a cover for illegal bookmaking.
 
 
 4
 The government further contended that after First Fidelity was closed by the State of Florida pending the adjudication of charges that it violated regulations governing mortgage brokers, McLain and others embarked upon large-scale drug running and distribution. The government accused McLain of distributing three kilograms of cocaine on one occasion, and of possessing ten kilograms with the intent to distribute on another. He also allegedly conspired to import four hundred kilograms of cocaine. At trial, the government introduced evidence showing that the defendants buttressed their loansharking and narcotics distribution efforts with threats of physical harm and with electric cattle prods and automatic weapons.
 
 II. THE MISCONDUCT AT TRIAL
 
 5
 The facts garnished from the voluminous trial transcript brand this trial as a classic example of judicial error and prosecutorial misconduct combining to deprive the appellants of a fair trial. To begin, the trial judge, in her efforts to expedite the trial, allowed the discipline and decorum, inherently necessary to the proceedings, to unravel before her. With the trial barely underway, it soon became clear that the court's time allotment of eight weeks (200 hours) was an insufficient estimate of how long the trial would last. The judge became increasingly agitated about the pace at which the trial was proceeding. (R. 9-282).[3] When the trial did not speed up to her liking, the trial judge carried out her threat of extended daily court sessions and ordered that henceforth the trial would commence at 7:30 each morning and end at 5:00 each evening, Mondays through Thursdays. (R. 11-1043). This schedule commenced December 3, 1984, and continued through January 29, 1985.
 
 
 6
 Throughout the trial, the judge's insistence on completing the trial as scheduled manifested itself in constant reminders to the attorneys to pick up the trial's pace. (R. 19-3609). Furthermore, she informed the attorneys that they were being clocked by the courtroom deputy clerk, and she periodically announced how much court time had passed and how much time each attorney had used. (R. 23-4887B, 4887C, 26-5947, 50-3309, 68-5606, 82-7599). The judge's emphasis on speed stemmed from her desire to prevent any backlog of other cases on her docket.[4] The judge's final ultimatum to the attorneys best typifies the emphasis on haste throughout the trial: "[t]his case better go to the jury the week of March 12th. I'm telling you all that right now or you are really going to see a show in here the week of March 18th like they haven't seen around this building." (R. 69-5824).
 
 
 7
 Of course, this court is cognizant of the maxim that the trial judge has broad discretion in handling the trial and that the reviewing court should restrain itself from interposing its opinion absent a clear showing of abuse. United States v. Gomez-Rojas, 507 F.2d 1213, 1223 (5th Cir.1975), cert. denied, 423 U.S. 826, 96 S.Ct. 41, 46 L.Ed.2d 42 (1975). Indeed, "[t]he judicial role extends to ... controlling the trial and its participants so as to minimize confusion and delay while maximizing orderly, clear, and efficient presentation of the evidence." United States v. McDonald, 576 F.2d 1350, 1358 (9th Cir.1978), cert. denied, 439 U.S. 830, 99 S.Ct. 105, 58 L.Ed.2d 124 (1978) (emphasis added). With respect to the case at bar, the trial judge's efforts to speed up the pace not only rushed the attorneys, but also allowed the proceedings to get out of hand, seriously impeding appellants' rights to a fair trial.
 
 
 8
 There are numerous examples of how this excruciating trial schedule reduced the effectiveness of the jury. To begin, the trial judge and counsel noticed that the jurors were becoming restless and inattentive. Although she outwardly praised their efforts,[5] the judge began to take steps to ensure their attentiveness. She began by allowing the jury to stand during breaks in the testimony. (R. 12-1321, 1395, 1475, 1477, 13-1572, 1583, 1655, 1690, 1795, 1819, 1846, 1881). She instructed the marshals present in the courtroom to observe the jurors to prevent their slumber. (R. 13-1626, 1627). Food and coffee were available to jurors while they were seated in the jury box. (R. 24-5200). Eventually, the jurors and witnesses were allowed to stand while the attorneys were conducting their examinations. (R. 17-2990, 3105, 3202, 3204). This occurred during the cross-examination of Alton Dale Sparks, an important witness for the government. At one point after the judge instructed the jury and Mr. Sparks to stand, counsel for defendant McLain asked incredulously "[y]ou want me to proceed?" We likewise find it unsettling that the court ordered such actions. This continuous motion in the jury box interfered with the attorney's performance. More importantly, the standing, and eating only served to break the jurors' concentration. Allowing this kind of behavior was deleterious to the jury's appreciation of their important responsibilities.[6]
 
 
 9
 Not only were the judge's attempts to keep the jury alert disturbing, they were also ineffective. There were complaints of jurors sleeping the very first day of the seven-thirty schedule. (R. 12-1411). This continued throughout the trial. (R. 13-1625, 16-2694, 17-3003, 3004). Finally, the court discharged one juror before the jury deliberations. (R. 88-8214).[7] "Due process means a jury capable and willing to decide the case solely on the evidence before it, and a trial judge ever watchful to prevent prejudicial occurrences and to determine the effect of such occurrences when they happen." Smith v. Phillips, 455 U.S. 209, 217, 102 S.Ct. 940, 946, 71 L.Ed.2d 78 (1982), on remand 552 F.Supp. 653, (S.D.N.Y.1982), aff'd, 717 F.2d 44 (2d Cir.1983), cert. denied, 465 U.S. 1027, 104 S.Ct. 1287, 79 L.Ed.2d 689 (1984). Although the court eventually discharged the sleeping juror, this is but one example of the lower court's failure to ensure a fair trial to the defendants.
 
 
 10
 The lower court's insistence on preserving its extended daily timetable also had a serious effect upon the attorneys' ability to stay alert and provide adequate representation for their clients. The attorneys complained that in addition to the seven-thirty to five o'clock court schedule, they often worked until midnight preparing for the next day. This fact was brought to the court's attention several times, and McLain's attorney claimed exhaustion as the major factor in his motion to withdraw from acting as counsel for McLain. (R. 12-1525, 13-1895). Although the court sympathized with the counsel's requests, nothing was done to ease the schedule.
 
 
 11
 This case exemplifies the adage: "justice which is too swift may result in a denial of the right to a fair trial." United States v. Diharce-Estrada, 526 F.2d 637, 638 (5th Cir.1976) (Trial court's opening remarks to the jury emphasizing his preference for an expedient trial, coupled with immoderate treatment accorded defense counsel, put undue pressure on jury to reach a verdict more swiftly than the ends of justice would permit.). Courts have upheld efforts to expedite cases within legitimate circumstances. For example, this conduct is permissible for the limited purpose of avoiding repetitions and thereby moving the case along more efficiently. United States v. Johnson, 657 F.2d 604 (4th Cir.1981). Also, it is acceptable for courts to shepherd along "an uncomplicated trial of fairly basic issues [showing] only judicial economy rather than prejudicial judicial intervention." United States v. Anderson, 528 F.2d 590, 592 (5th Cir.1976), cert. denied, 429 U.S. 837, 97 S.Ct. 105, 50 L.Ed.2d 103 (1976). We can distinguish this case from Johnson and Anderson as repetitious questioning was not the main reason for the trial judge's actions, and the case was obviously a long, complicated battle. A case involving a defendant facing a prison sentence is much more important than an overcrowded court docket. Consequently, this case was deserving of more patience than the judge gave it, and the appellant's case was prejudiced by this lack of care.
 
 
 12
 In addition to objecting to the trial judge's management of the trial, the appellants also protest the prosecuting attorney's conduct. To begin, the prosecutor continuously made critical remarks about the character of appellant McLain's counsel. The prosecutor, in the jury's presence, repeatedly accused Mr. McLain's counsel of intentionally misleading the jurors and witnesses and of lying in court. (R. 17-3066, 31-548; 48-3018, 3019; 52-3537, 3538, 3539, 3634, 3635). This court has held that the function of counsel is almost as important as that of the judge, therefore, counsel is entitled to courtesy and respect. Zebouni v. United States, 226 F.2d 826, 827 (5th Cir.1955). To discredit defense counsel in front of the jury is improper, and even subsequent jury instructions aimed at rectifying this error may not ensure that these disparaging remarks have not already deprived the defendant of a fair trial. Id. Such remarks are plain error as they affect substantial rights of the defendant. Fed.Rules Crim.Proc. 52(b).[8]
 
 
 13
 McLain claims that the prosecutorial misconduct was intended to provoke mistrial requests, thereby subjecting him to the substantial burdens of multiple prosecutions. He therefore requests this court to apply double jeopardy considerations and bar any retrial. We hold that a retrial in this case is not barred by the double jeopardy clause since there is no convincing evidence that the prosecutor intended to cause a mistrial request to further his chances of a conviction. United States v. Rios, 637 F.2d 728 (10th Cir.1980), cert. denied, 452 U.S. 918, 101 S.Ct. 3054, 69 L.Ed.2d 422 (1981) (Double jeopardy clause protects a defendant against governmental actions intended to provoke mistrial requests and thereby to subject defendant to substantial burdens imposed by multiple prosecutions).
 
 
 14
 "Reversal on the basis of prosecutorial misconduct requires that the misconduct be 'so pronounced and persistent that it permeates the entire atmosphere of the trial.' " United States v. Weinstein, 762 F.2d 1522, 1542 (11th Cir.1985), cert. denied, --- U.S. ----, 106 S.Ct. 1519, 89 L.Ed.2d 917 (1986), (quoting United States v. Blevins, 555 F.2d 1236 (5th Cir.1977), cert. denied, 434 U.S. 1016, 98 S.Ct. 733, 54 L.Ed.2d 761 (1978). We find that the prosecutor's misconduct did not permeate the entire atmosphere of the trial. Instead, it was the cumulative effect of the errors committed by the judge and prosecutor that denied the defendants a fair trial. United States v. Diharce-Estrada, 526 F.2d 637, 640 (5th Cir.1976). Consequently, a new trial is in order.
 
 III. THE CONFLICTS OF INTEREST
 
 15
 Appellant Seymour Sher was further prejudiced by a conflict of interest with his attorney, which deprived Sher of his Sixth Amendment right to a competent counsel.
 
 
 16
 After his conviction, Sher moved for dismissal or, in the alternative, for a new trial based upon the ground of newly discovered evidence. Fed.R.Crim.Proc. 33. This new evidence consisted of Sher's post-conviction realization that his attorney, Paul Johnson, was under investigation for two Hobbs Act violations before and during Sher's trial. The same United States Attorney's office that tried Sher conducted the investigation of Johnson. After Sher's conviction, Johnson was indicted for said violations.[9] Although Johnson and the assistant U.S. attorney who prosecuted Sher shared this information, they failed to inform the district court and Sher. Johnson's records were subpoenaed four times while he was Sher's attorney, and Johnson had conflicts with United States Attorney Merkle over his trying to help another individual being investigated and/or prosecuted by Merkle. (Transcript of Proceedings, March 31, 1986, p. 9, lines 1-7). In March 1985, Assistant United States Attorney Mueller (Sher's prosecutor) and United States Attorney Merkle discussed the need to avoid an indictment of Johnson until after the jury returned with its verdict in Sher's case. (Transcript of Proceedings, March 27, 1986, pp. 136-138). After Sher's conviction, Johnson hired F. Lee Bailey and Richard Gerstein as counsel and attempted to go over United States Attorney Merkle's head to the Justice Department in Washington, D.C. to negotiate. (Transcript of Proceedings, March 31, 1986, pp. 6-7.).
 
 
 17
 Sher's basic argument is that Johnson's knowledge that he was under investigation by the same United States attorney's office that was prosecuting Sher created a conflict of interest, which reduced Johnson's effectiveness as Sher's counsel, thereby depriving Sher of his Sixth Amendment rights. The district court concluded, after hearing testimony for both Sher and the government, that there was no conflict of interest and that Sher was adequately represented by Johnson. The Supreme Court has held that the determination of whether counsel suffered a conflict of interest by engaging in representation of multiple clients is a mixed determination of law and fact and is open to review on collateral attack in a federal court. Cuyler v. Sullivan, 446 U.S. 335, 342, 100 S.Ct. 1708, 1714, 64 L.Ed.2d 333 (1980). Since this case likewise involves determinations of historical facts and the application of legal principles to these facts, it is subject to review by this court using normal evidentiary principles.
 
 
 18
 The applicable law in this case is clear. "In order to establish a violation of the Sixth Amendment, a defendant who raised no objection at trial must demonstrate that an actual conflict of interest adversely affected his lawyer's performance." Id. at 348, 100 S.Ct. at 1718. We find both of the Cuyler hurdles are met. It is clear that, ethically speaking, "[a] lawyer should not accept proffered employment if his personal interests or desires will, or there is a reasonable possibility that they will, affect adversely the advice to be given or services to be rendered the prospective client." Model Code of Professional Responsibility EC 5-2 (1987). (Emphasis added). Furthermore,
 
 
 19
 "In those instances in which a lawyer is justified in representing two or more clients having differing interests, it is nevertheless essential that each client be given the opportunity to evaluate his need for representation free of any potential conflict and to obtain other counsel if he so desires. Thus, before a lawyer may represent multiple clients, he should explain fully to each client the implications of the common representation and should accept or continue employment only if the clients consent."
 
 
 20
 Id. at EC 5-16.
 
 
 21
 Johnson was under an ethical obligation to inform Sher of the investigation and the possibility that it would affect Johnson's judgment while acting as Sher's counsel. Moreover, we find that an actual conflict of interest did exist. This conflict manifested itself in Johnson's benefit from Sher's prolonged trial. There is substantial evidence that the United States attorney would not attempt to indict Johnson until Sher's trial ended.[10]
 
 
 22
 Therefore, it was in Johnson's best interests for Sher to have a lengthy trial. Although Johnson testified that he was not worried about the investigation, his client, having hired Johnson for his sterling reputation would have reacted differently. Furthermore, the increased intensity of the government's investigation of Johnson's records should have convinced him of the seriousness of his situation and the conflict between his desires to aide his client and save himself.
 
 
 23
 This actual conflict of interest adversely affected the competency of Johnson's representation of Sher. Johnson's competence was most lacking in the area of plea negotiations. Mr. Johnson admitted that he was informed by the United States investigators that Sher was the only defendant who had not tried to work out a deal with the government. (Transcript of Proceedings, March 31, 1986, p. 16, lines 18-25). Actually, Sher (through Johnson) had attempted a negotiated plea, however, the Middle District of Florida United States Attorney's Office will negotiate pleas in racketeering cases only if the defendant agrees to testify against all co-defendants. Since Sher would not testify against co-defendant Cocchiaro for fear of harm to himself or his family, this negotiated plea fell through. We find that Johnson failed to press the fact that Cocchiaro was only one of many co-defendants that Sher could testify against. Furthermore, Johnson could have gone over United States Attorney Merkle's head to the Justice Department like he did later when he was indicted. Exploring possible plea negotiations is an important part of providing adequate representation of a criminal client, and this part is easily precluded by a conflict of interest. Holloway v. Arkansas, 435 U.S. 475, 490, 98 S.Ct. 1173, 1181, 55 L.Ed.2d 426 (1978). Although the Justice Department's response to this possible action on Sher's behalf is uncertain, the fact that Sher was neither informed of Johnson's conflict of interest, nor counseled towards this avenue of plea negotiations should be weighed in Sher's favor. Johnson's failure to advise Sher of this possibility due to his conflicting interest of saving this tactic for his own criminal defense deprived Sher of a fair trial.[11]
 
 IV. THE CO-DEFENDANTS' GUILTY PLEAS
 
 24
 Appellant McLain challenges the government's introduction of several co-defendants' guilty pleas into evidence. The co-defendants, namely Mel Kaplan, Barry Nelson and Stanley Seligman, had previously pled guilty to various crimes. Kaplan pled guilty to possession of cocaine, while Nelson and Seligman both pled guilty to racketeering. During its opening statement the government mentioned that the three co-defendants had pled guilty and would testify at trial. (R. 8-29). However, Kaplan was the only witness called to testify. During Kaplan's testimony, the government introduced an unredacted text of his plea agreement. (R. 40-1828). Over the objection of McLain's attorney, the court allowed the introduction of the plea agreement. In the course of cross-examining defense witness Devin Tranter, the government introduced the redacted plea agreements of Nelson and Seligman. These redacted plea agreements were not objected to at trial.
 
 
 25
 The admission of guilty pleas by co-defendants not subject to cross-examination is generally considered plain error. United States v. Avery, 760 F.2d 1219 (11th Cir.1985), cert. denied, 474 U.S. 1055, 106 S.Ct. 792, 88 L.Ed.2d 770 (1986). Therefore, under the auspices of Fed.R.Crim.P. 52(b), the error is subject to reversal even though there was no objection. In most occasions, the admission of a co-defendant's guilty plea will substantially affect the defendant's right to a fair trial in that "the jury may regard the issue of the remaining defendant's guilt as settled and that the trial is a mere formality." United States v. Griffin, 778 F.2d 707, 711 (11th Cir.1985). However, there are several examples where proof of a co-defendant's guilty plea was correctly admitted for recognized evidentiary purposes. See United States v. Baez, 703 F.2d 453 (10th Cir.1983) (when co-defendants plead guilty mid-trial, judge may so inform the jury to prevent speculation on their absence); United States v. Harrell, 436 F.2d 606 (5th Cir.1970) (impeachment of co-defendant's trial testimony); United States v. Edwards, 716 F.2d 822 (11th Cir.1983) (government may introduce co-defendant's guilty plea to rehabilitate the credibility of its witness).
 
 
 26
 The traditional standard for admission of a co-defendant's guilty plea comes under Fed.R.Evid. 403, i.e., relevant evidence may be excluded if its probative value is outweighed by its unfair prejudicial impact. Griffin, 778 F.2d at 709. A co-defendant's guilty plea may not be used as substantive evidence of the defendant's guilt. However, there are many factors to consider.
 
 
 27
 [W]e must carefully examine all the facts and circumstances of the case in their proper context. The presence or absence of an instruction is an important factor, but it is also essential to consider other factors, such as whether there was a proper purpose in introducing the fact of the guilty plea, whether the plea was improperly emphasized or used as substantive evidence of guilt, whether the introduction of the plea was invited by defense counsel, whether an objection was entered or an instruction requested, whether the defendant's failure to object to the testimony could have been the result of tactical considerations, and whether, in light of all the evidence, the failure to give an instruction was harmless beyond a reasonable doubt.
 
 
 28
 United States v. King, 505 F.2d 602, 608 (5th Cir.1974).
 
 
 29
 In this case, the issue needs breaking down into two areas of discussion. To begin, the redacted guilty pleas of Nelson and Seligman were properly introduced into evidence. Although there was no jury instruction, the prosecutor had a proper purpose in introducing the plea agreements. McLain's attorney had continually emphasized Nelson's, Seligman's and Kaplan's plea agreements in an attempt to show the jury that they were the true criminals and had agreed to testify against McLain in return for a "sweetheart deal" from the government. (R. 8-74). Almost immediately into his opening statement, McLain's attorney told the jury:
 
 
 30
 All of the critical Government witnesses, and it's interesting to note that Mr. Mueller spoke about a couple of witnesses who have pled guilty to certain crimes facing 20 years, you are going to hear as a result of the cross-examination that they are not facing 20 years, that those witnesses are no more puppets on a string, that if they pled guilty sometime go they should have been sentenced, but for the fact that their performance is on trial, the quality of what they say against Denny McLain is the thing that is on trial, and they ultimately will get sentenced possibly to probation or possibly to no jail time at all, depending upon how they perform. (R. 8-64).
 
 
 31
 McLain's attorney then proceeded throughout the trial to refer to Nelson, Seligman, and Kaplan as crooks. (R. 24-5406; 255527-8, 5533-34, 5570-5574, 5578). Finally, in his closing statement McLain's attorney emphasized all three of the co-defendant's hopes for probation in return for their testimony against his client. (R. 85-7931, 86-8036, 8041).[12] It is clear that McLain's failure to object to the introduction of Nelson's and Seligman's redacted plea agreements was the result of tactical considerations on the part of his attorney. The government's limited purpose in introducing Nelson's and Seligman's pleas was to show that there was no agreement in writing offering them a light sentence for their testimony against McLain. These facts fit the King criterion and lead us to the conclusion that the redacted plea agreements were admissible. Furthermore, these facts are comparable to United States v. Chilcote, 724 F.2d 1498 (11th Cir.1984), cert. denied, 467 U.S. 1218, 104 S.Ct. 2665, 81 L.Ed.2d 370 (1984), wherein a co-defendant's plea agreement was correctly admitted by the court when it was not improperly used as substantial evidence of the defendant's guilt by the government, and the defense counsel's referrals to the guilty plea, plus his failure to object or request judicial instructions reflected his ulterior tactical calculations.
 
 
 32
 Although the actual plea agreements were sent back with the jury for their deliberations, we find that since they were introduced in a redacted form their prejudice did not outweigh their probative value. In other words, as the plea agreements said only what had already been reported to the jury at trial (i.e., that the co-defendants had no "sweetheart deal" in writing), there was no extra information "dragged in by the heels for the sake of its prejudicial effect." United States v. McRae, 593 F.2d 700, 707 (5th Cir.1979), cert. denied, 444 U.S. 862, 100 S.Ct. 128, 62 L.Ed.2d 83 (1979).
 
 
 33
 With these standards in mind it was clear error to admit co-defendant Kaplan's unredacted plea agreement into evidence. McLain's attorney did object to the admission of the plea. (R. 40-1828). Although the government was properly trying to rehabilitate Kaplan on redirect examination, and the trial judge did instruct the jury that the plea agreement could only be considered by them for the purposes of evaluating Kaplan's credibility (R. 40-1830), this is not enough to overcome the prejudicial impact of introducing the plea agreement in its entirety. The plea not only tended to show that Kaplan had lied on the stand saying he had no knowledge of drug transactions among himself and his co-defendants, it also included information harmful to McLain's defense with no probative value concerning Kaplan's veracity. To allow the jury to take the whole plea into deliberations was clear error and requires reversal.[13]
 
 V. THE SEVERANCE MOTION
 
 34
 Appellant Sher contends that the trial court abused its discretion by denying his motions for severance. He argues that there were multiple conspiracies which were misjoined in the indictment. Therefore, the evidence used against one defendant was unrelated to the other defendants, and unduly prejudiced each co-defendant's case. Sher and McLain were, among others, indicted in the first count with racketeering and the collection of unlawful debts, in violation of 18 U.S.C. Sec. 1962(c). This racketeering allegedly consisted of the (1) collection of unlawful debts, (2) collection of extensions of credit by extortionate means, (3) interference with commerce, (4) bookmaking and (5) conspiracy to import and distribute controlled substances, namely cocaine.
 
 
 35
 Joinder of defendants in a multi-party indictment is assessed under Fed.R.Crim.P. 8(b).[14] The litmus test for misjoined counts under Rule 8(b) is whether the acts described in the indictment are tied by a "common thread" to each other or the participants. United States v. Weinstein, 762 F.2d 1522, 1541 (11th Cir.1985), cert. denied, --- U.S. ----, 106 S.Ct. 1519, 89 L.Ed.2d 917 (1986). Misjoinder under the rule is prejudicial per se. United States v. Levine, 546 F.2d 658 (5th Cir.1977). However, even if Rule 8(b) is not violated, the defendant is still entitled to a severance if he can show specific and compelling prejudice due to the counts being joined, i.e., by showing that the jury could not keep the evidence against each defendant separate. United States v. Avery, 760 F.2d 1219 (11th Cir.1985), cert. denied, 474 U.S. 1055, 106 S.Ct. 792, 88 L.Ed.2d 770 (1986). To allow such compellingly prejudicial evidence would be an abuse of discretion by the trial court. United States v. Padilla-Martinez, 762 F.2d 942 (11th Cir.), cert. denied, 474 U.S. 952, 106 S.Ct. 320, 88 L.Ed.2d 302 (1985).
 
 
 36
 Sher claims that the loansharking and bookmaking counts against McLain and himself were improperly joined with the drug counts against McLain. "The government is not required to prove that a conspirator had full knowledge of all the details of the conspiracy; knowledge of the essential nature of the plan is sufficient." United States v. Brasseauz, 509 F.2d 157, 160 n. 3 (5th Cir.1975). In this case, the government was able to show that the loansharking and bookmaking activities were conducted in the First Financial Services location in which Sher was connected. However, the government also was allowed to introduce evidence concerning the importation and distribution of cocaine, in which only McLain was allegedly involved. The evidence at trial showed that McLain, in need of money, began to associate with people Sher did not know in order to facilitate a drug smuggling operation. McLain told his partners in the drug transactions that Sher was ignorant of these dealings. (R. 9-506). In fact, Sher was never connected by the government to any of the drug operations. Still, he and the jury were deluged with testimony concerning these dealings. They were told of a McLain associate using a cattle prod known as the "social worker's kit" to force drug buyers to make timely and accurate payments. (R. 51-96). More importantly, the jury heard Todd Seigmeister testify that he and McLain had plotted to murder a drug buyer, by flying him over the Gulf of Mexico, shooting him in the head, and throwing the corpse out of the plane and into the ocean. (R. 48-3046). This testimony came in despite numerous objections by Sher's attorney. Such evidence was overly prejudicial to Sher, and it is this court's opinion that the jury could not ignore this evidence in determining Sher's guilt. It is clear that the RICO count contained two separate conspiracies, that the drug-related activities were unconnected to the loansharking and bookmaking conspiracy, and that appellant Sher was not connected to the drug related conspiracy. Therefore, the trial court abused its discretion in failing to grant Sher's severance motions.
 
 VI. PRESENTENCE REPORT
 
 37
 Rule 32(c) of the Fed.R.Crim.P. holds that, unless waived by the defendant, the probation service must make a presentence investigation, and report same to the court. This requirement insures that there is a record containing information about the defendant at the court's disposal, allowing it to mete out just sentences. Essential to this report is the victim-impact statement which contains "information concerning any harm, including financial, social, psychological, and physical harm, done to or loss suffered by any victim of the offense." Fed.R.Crim.P. 32(c)(2)(C). McLain challenges the probation service's victim-impact statement in his presentence report on two grounds.
 
 
 38
 First, McLain argues that the probation service failed to conduct an adequate victim-impact statement. Cases have held that the information provided by the probation service is an informative document for the guidance of the court, not a prosecutorial tool. United States v. Trevino, 556 F.2d 1265 (5th Cir.1977). Appellant claims that in this case the victim-impact statement was merely a restatement of information garnered at trial and provided to the probation service by the prosecutor. The appellee points out that there are no steps laid out in Rule 32 for preparing the statement, and evidence obtained at trial is often the only factual basis for such a report. Also, Rule 32 provides the defendant an opportunity to challenge any assertions in the statement with which he disagrees. Therefore, we choose only to address McLain's second argument.
 
 
 39
 Appellant's second argument is that the district court failed to comply with Fed.R.Crim.P. 32(c)(3)(D). This provision states that if the defendant alleges any factual inaccuracy in the presentence investigation, the court must "make (i) a finding as to the allegation, or (ii) a determination that no such finding is necessary because the matter controverted will not be taken into account in sentencing." These findings must be in writing and appended to the presentence investigation report. The district court, upon notice of factual inaccuracies by the appellant, failed to make a written finding in contravention to Rule 32(c)(3)(D). This would warrant re-sentencing, however, this will only be necessary upon the possibility of another guilty verdict after McLain has been re-tried.
 
 VII. CONCLUSION
 
 40
 We find that the trial court's emphasis on an accelerated trial, compounded with the prosecutor's inappropriate and prejudicial comments, denied the appellants their basic right to a fair trial.
 
 
 41
 Additionally, we conclude that the district court erred in (1) allowing the introduction of Mel Kaplan's unredacted plea agreement, (2) failing to grant a severance to appellant Sher, and (3) failing to make findings in response to appellant McLain's assertions of factual inaccuracies in the probation service's presentence investigation report.
 
 
 42
 Accordingly, the judgment of the district court is REVERSED and the case is REMANDED for proceedings consistent with this opinion.
 
 
 
 [1]
 The cause for the mistrial is unrelated to this appeal
 
 
 [2]
 Nelson also pled guilty to racketeering charges
 
 
 [3]
 The judge began to pressure all counsel present to speed up the proceedings:
 The Court: Now, gentlemen, I want to talk to you about something real seriously before this jury comes in and I want you to think about the answer to it over lunch, because I'm going to ask you about it.
 We are doing pretty good at putting in six hours a day in this case but this case is moving very slowly and this court has set aside eight weeks to try the case. And now, as I am often--as I have often said at other times, I cannot manufacture time. I can only manage the time that there is on a twenty-four-hour clock. We're in trial four days a week. I would not like to increase the number of hours per day four days a week, but I will do it and I want you to know it's absolutely thrilling to start a trial at seven o'clock in the morning, absolutely thrilling. Everybody is alert. Put in a full day ... This case had better start moving or we are going to go to that schedule and I want you to know if you don't believe that I would do it, you better check my track record in Orlando and here (Tampa). (R. 11-851, 852).
 
 
 [4]
 The trial judge pressed the attorneys with arguments such as:
 The Court: See the problem is, and I won't belabor the point, all the other cases I have got to deal with require me, you have got to be noticing I am trying to keep the rest of the world going while this trial is going on. I have got a very important case that I want to try and book on Thursday, and you're just knocking this right out. I had one resolved and I've got another important one that is crying for time on my calendar. (R. 69-5823, 5824).
 Courts have emphasized that, although extremely overcrowded dockets develop the necessity for irregular trial schedules, the defendant's right to a fair trial should remain a paramount factor in the trial judge's mind. United States v. Diharce-Estrada, 526 F.2d 637 (5th Cir.1976).
 
 
 [5]
 The judge defended the jury's alertness saying, "[t]hey're being good troops and I want that on the record." (R. 22-4658)
 
 
 [6]
 A good example of the jury's attitude occurred during Tampa's annual Gasparilla celebration when a juror requested the judge to open the drapes so that the jury could view the parades during the trial. (R. 61-4663)
 
 
 [7]
 There were several discussions concerning what to do with the sleeping juror. For example:
 The Court: During the course of the trial which commenced with the presentation of testimony after the jury was sworn November the 26th, this court has observed that Juror No. 10, who is from Tampa, Miss Euhlia Warren, has considerable problem in remaining with her eyes open through the course of the proceedings ...
 Mr. Levine [McLain's attorney]: Judge, it's even worse in keeping her eyes closed, I mean her head was back and even when you called a recess she didn't even respond to it. I was going to bring it to your attention.
 The Court: I'm already aware of it. (Later).
 Mr. Johnson (Sher's attorney): To echo what the Court said, Mr. Lang is in a position as he has been sworn and we have been carrying on discussions since the trial began that she does appear to sleep a great deal of the time.
 Now, sometimes it may be said she just merely is closing her eyes, but like today she was going to sleep. She did not hear the comment of the coffee. When the rest of the jury rose today to go out, she was still sitting down until someone moved her chair and woke.
 Mr. Mueller [Assistant United States Attorney]: She snapped up pretty quickly. I don't think anybody touched her. She could be subconsciously hearing. (R. 12-1411, 1412).
 
 
 [8]
 The prosecutor also stated that: "The taxpayers who are paying our wages, we consider part of the prosecution team." (R. 69-5692). Although he later retracted the statement, a jury cannot always be trusted to follow instructions to disregard improper statements. Bruton v. United States, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968)
 
 
 [9]
 The charges against Paul Johnson allege that he was a conduit for a bribe relating to a borrow pit permit vote by the Hillsborough County Commissioners on July 22, 1981, with the alleged bribe payments occurring at intervals through Fall 1982. The second charge was for perjury
 
 
 [10]
 As explained above, Sher's case was not moving to the trial court's satisfaction, so it was understandable that Assistant United States Attorney Mueller would not risk fueling the court's wrath by indicting Johnson, thereby prompting Sher to seek new trial counsel
 
 
 [11]
 Of course, had he known of Johnson's conflict of interest, Sher might have chosen to waive his right to conflict-free counsel after a hearing had been conducted concerning this issue pursuant to United States v. Garcia, 517 F.2d 272 (5th Cir.1975); see In re Paradyne Corp., 803 F.2d 604, 610-11 (11th Cir.1986); cf. United States v. Hobson, 672 F.2d 825 (11th Cir.1982)
 
 
 [12]
 McLain's attorney summarized his theory in closing argument: "you talk about dealing with Barry Nelson, saying he's got probation, and we know what Seligman got, he's washed, he's free and clear of any charges. And yet, he's admitted time after time after time, ripping off these investors without conscience." (R. 85-7931)
 
 
 [13]
 Appellants also raise issues concerning the admission of other hearsay statements. We find no clear abuse of discretion by the lower court and thereby rule that further discussion is unwarranted
 
 
 [14]
 Fed.R.Crim.P. 8(b) provides:
 Two or more defendants may be charged in the same indictment or information if they are alleged to have participated in the same act or transaction or in the same series of acts or transactions constituting an offense or offenses. Such defendants may be charged in one or more counts together or separately and all of the defendants need not be charged in each count.