**Patrick RUGIERO, Petitioner,**

v.

**UNITED STATES of America, Respondent.**

No. CRIM. 90–80941–01.
No. CIV. 96–40376.

United States District Court,
E.D. Michigan,
Southern Division.

Aug. 19, 2004.

David I. Schoen, Montgomery, AL, for petitioner.

Richard L. Delonis, Kathleen M. Nesi, U.S. Atty's Office, Detroit, MI, for respondent.

## OPINION AND ORDER (1) OVERRULING THE GOVERNMENT'S OBJECTIONS, (2) ACCEPTING AND ADOPTING REPORT AND RECOMMENDATION, AND (3) GRANTING PETITIONER'S MOTION TO VACATE SENTENCE

GADOLA, District Judge.

Before the Court is Petitioner's motion to vacate his sentence pursuant to 28 U.S.C. § 2255. The thrust of Petitioner's § 2255 motion is that, in violation of the Sixth Amendment, his former counsel, N.C. Deday LaRene, had a personal interest conflict that adversely affected LaRene's representation of Petitioner: LaRene was the subject of a federal investigation during the pretrial and trial proceedings in Petitioner's case. LaRene was indicted between Petitioner's trial and sentencing. LaRene later pled guilty to conspiracy and tax charges and was sentenced to twelve months of imprisonment.

The Court referred the § 2255 motion to the Honorable Steven D. Pepe, United States Magistrate Judge, for a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and Rule 72(b) of the Federal Rules of Civil Procedure. On April 30, 2004, Magistrate Judge Pepe issued a report and recommendation (hereinafter "R & R") recommending that the Court grant Petitioner's § 2255 motion. On June 21, 2004, the Government filed objections to the R & R in which the Government requests that the Court reject the R & R and deny Petitioner's § 2255 motion. On July 27, 2004, Petitioner filed a response to the Government's objections.[1]

---

1. Note further that, on May 13, 2004, Petitioner filed "limited objections to portions of [the R & R]," in which Petitioner references issues not addressed in the R & R. In these "limited objections," Petitioner states: "To be clear, ... [Petitioner] does not assert that this Court now needs to consider these issues; rather, he raises the objections to avoid any possible claim of waiver if the [G]overnment seeks further litigation of this matter. [Petitioner] wishes to have all arguments for relief available for any further litigation." See Pet'r Limited Objs. at 4. See also R & R at 25.

On August 5, 2004, the Court held a hearing on the objections.

For the reasons set forth below the Court will overrule the Government's objections, accept and adopt the R & R, and grant Petitioner's § 2255 motion. The Court commends Magistrate Judge Pepe for his diligent and thorough work on this matter. This opinion and order is not intended to supplant the R & R. The R & R is so sound that the Court could accept and adopt it without further comment. However, given the importance of the matter, the Court believes some additional comment is warranted. Nonetheless, this opinion and order is intended only to amplify certain points in light of the Government's objections, and this opinion and order and the R & R should be read as one integrated document.

## I. PROCEDURAL BACKGROUND

On June 19 and 23, 1992, a jury of his peers convicted Petitioner of (count one) conspiracy to distribute, or possess with intent to distribute, cocaine and heroin, 21 U.S.C. § 846, and (count two) distribution of cocaine, 21 U.S.C. § 841(a)(1). *See United States v. Rugiero*, 804 F.Supp. 925, 926 (E.D.Mich.1992) (Gadola, J.). The jury acquitted Petitioner on three other drug counts. On October 6, 1992, the Court sentenced Petitioner to 360 months of imprisonment and five years of supervised release.

The United States Court of Appeals for the Sixth Circuit affirmed Petitioner's conviction and sentence on March 22, 1994. *See United States v. Rugiero*, 20 F.3d 1387, 1392–95 (6th Cir.1994). The Supreme Court of the United States denied Petitioner's petition for the writ of certiorari on October 3, 1994. *See Rugiero v. United States*, 513 U.S. 878, 115 S.Ct. 208, 130 L.Ed.2d 137 (1994).

On October 28, 1996, Petitioner filed a motion to vacate his sentence pursuant to 28 U.S.C. § 2255. On November 20, 1997, the Court referred the § 2255 motion to Magistrate Judge Pepe. On April 30, 2004, after prolonged discovery proceedings, Magistrate Judge Pepe issued the aforementioned R & R.

## II. FACTUAL BACKGROUND

The Court relies on the extensive background section in the R & R, *see* R & R at 1–19; nevertheless, it is important to highlight certain facts and dates.

On November 11, 1990, a federal grand jury indicted Petitioner in this case.

On December 14, 1990, the Government opened a criminal investigation into possible extortion, money laundering, and conspiracy charges against LaRene and one of his clients, Vito Giacalone.

On February 28, 1991, Petitioner retained LaRene in Petitioner's criminal case.

On August 8, 1991, the Government subpoenaed LaRene for handwriting exemplars, photographs, fingerprints, and non-privileged records of Giacalone. This subpoena was LaRene's first notice of the Government's investigation. *See* Gov't Objs. at 3; *see also* R & R at 12–13 n.12. Moreover, Keith Corbett, the Assistant United States Attorney assigned to LaRene's case, has stated that "[b]y at least ... the summer of '91, long before [Petitioner's] trial, [LaRene] knew the Government was looking at him." R & R at 12 n.12.

On September 4, 1991, the Government's LaRene/Giacalone investigation expanded to include possible tax charges.

In April 1992, a government document— known as a Special Agent's Report (hereinafter "SAR")—was wrongfully copied and disclosed to an individual connected to Giacalone. *See United States v. Forman*, 71 F.3d 1214, 1215–17 (6th Cir.1995). This

SAR was prepared by Special Agent Frank Scartozzi of the Internal Revenue Service (hereinafter "IRS"). The SAR included (1) a summary of the Government's LaRene/Giacalone investigation, (2) a statement of the Government's theory for the prosecution of the case, and (3) a discussion of potential defenses to the prosecution. LaRene had access to this illicit copy of Scartozzi's SAR. *See id.* at 1216; R & R at 12.

On May 5, 1992, Petitioner's trial began.

In June 1992, during jury deliberations and related court proceedings, Petitioner first became aware of the Government's criminal investigation of LaRene. *See Rugiero,* 804 F.Supp. at 927–28. This awareness resulted from local news broadcasts on June 17, 1992, which reported that LaRene was the subject of a federal criminal investigation. One of the broadcasts stated that the investigation of LaRene was complete and that the Government was waiting to indict LaRene until Petitioner's trial was completed.

As of August 6, 1992, according to the Government, the Government was still investigating LaRene, and it had not, at that juncture, decided whether it would prosecute LaRene.

On September 16, 1992, a federal grand jury indicted LaRene and Giacalone. The indictment alleged conspiracy, tax evasion, and aiding and abetting.

On October 6, 1992, the Court sentenced Petitioner. LaRene represented Petitioner at sentencing.

On December 9, 1993, the Sixth Circuit heard oral arguments on Petitioner's appeal, and LaRene argued for Petitioner.

On December 22, 1993, LaRene pled guilty—pursuant to a Rule 11 plea agreement filed on December 21, 1993—to conspiracy and tax charges, 18 U.S.C. § 371 and 26 U.S.C. § 7201. *See United States v. LaRene,* No. 92–80848–03 (E.D.Mich. Dec. 21–22, 1993).

On February 14, 1994, LaRene filed a motion with the Sixth Circuit to withdraw as counsel for Petitioner and to permit the substitution of new counsel; the Sixth Circuit granted the motion on March 11, 1994.

On March 22, 1994, the Sixth Circuit affirmed Petitioner's conviction and sentence.

On May 4, 1994, the Honorable Patrick J. Duggan, United States District Judge, sentenced LaRene to twelve months of imprisonment.

## III. LEGAL STANDARDS

To obtain relief pursuant to § 2255, a petitioner must establish any one of the following: (1) his sentence was imposed in violation of the Constitution or federal law; (2) the Court lacked jurisdiction to impose such a sentence; (3) the sentence exceeded the maximum allowed by law; or (4) his sentence is otherwise subject to collateral attack. *See* 28 U.S.C. § 2255.

The Court's review of a report and recommendation is de novo when, as here, timely objections to the report and recommendation have been filed. *See* Fed. R.Civ.P. 72(b); *Spooner v. Jackson,* 321 F.Supp.2d 867, 868–69 (E.D.Mich.2004) (Gadola, J.); *Lardie v. Birkett,* 221 F.Supp.2d 806, 807 (E.D.Mich.2002) (Gadola, J.). De novo review in these circumstances entails at least a review of the evidence that faced the magistrate judge; the Court may not act solely on the basis of a report and recommendation. *See* 12 Charles Alan Wright, Arthur R. Miller & Richard L. Marcus, *Federal Practice and Procedure: Civil 2d* § 3070.2 (1997)(citing *Hill v. Duriron Co.,* 656 F.2d 1208, 1215 (6th Cir.1981)). Whether the Court supplements the record by entertaining further evidence is a matter committed to the

Court's discretion. *See* 12 Wright, *Federal Practice* § 3070.2. After conducting this review, the Court is free to accept, reject, or modify the findings or recommendations of the magistrate judge. *See* Fed.R.Civ.P. 72(b); *Spooner,* 321 F.Supp.2d at 868–69; *Lardie,* 221 F.Supp.2d at 807.

## IV. ANALYSIS

### A. *Cuyler* versus *Strickland*

The Government's primary objection is the legal standard applied in the R & R to Petitioner's Sixth Amendment conflict claim. *See* Gov't Objs. at 7–9.

■ Conflicts of interest for attorneys representing criminal defendants are generally grouped into three categories: (1) concurrent representation (also referred to as joint, multiple, or simultaneous representation) of clients with conflicting interests, (2) successive representation of clients with conflicting interests (i.e., when counsel has previously represented a co-defendant or trial witness), and (3) conflicts that pit the attorney's personal interests against those of the defendant. *See* Mark W. Shiner, "Conflicts of Interest Challenges Post *Mickens v. Taylor:* Redefining the Defendant's Burden in Concurrent, Successive, and Personal Interest Conflicts," 60 *Wash. & Lee L.Rev.* 965, 971–72 (2003); *McFarland v. Yukins,* 356 F.3d 688, 701 (6th Cir.2004). The third type of conflict, a personal interest conflict, is at issue in this case.

■ It is well settled that when a concurrent representation conflict is at issue, the applicable legal standard is not the traditional ineffective-assistance-of-counsel standard set forth in *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), which requires a showing of prejudice (i.e., reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different); rather, it is the petitioner-favorable standard set forth in

*Cuyler v. Sullivan,* 446 U.S. 335, 100 S.Ct. 1708, 64 L.Ed.2d 333 (1980), under which prejudice is presumed and the petitioner need only show that there was an actual conflict that adversely affected his counsel's performance.

■ Here, the issue is which standard— *Cuyler* or *Strickland*—governs the particular personal interest conflict at issue in this case: the criminal investigation of counsel during the client's pretrial and trial proceedings. The R & R applied *Cuyler,* and the Government argues that *Strickland* should apply. *See* R & R at 22–24, 32–35; Gov't Objs. at 7–9.

The caselaw on this question is clouded, but the Court concludes that the R & R applied the correct standard, i.e., the *Cuyler* standard.

In 2002, the Supreme Court rendered a decision known as *Mickens v. Taylor,* 535 U.S. 162, 122 S.Ct. 1237, 152 L.Ed.2d 291 (2002). Dicta in *Mickens* cautioned lower courts against blindly using *Cuyler. See Mickens,* 535 U.S. at 174–75, 122 S.Ct. 1237. *Mickens* stated:

> [The] Courts of Appeals ... have applied [*Cuyler*] unblinkingly to all kinds of alleged attorney ethical conflicts. They have invoked the [*Cuyler*] standard not only when (as here) there is a conflict rooted in counsel's obligations to former clients, but even when representation of the defendant somehow implicates counsel's personal or financial interests, including a book deal, a job with the prosecutor's office, the teaching of classes to Internal Revenue Service agents, a romantic entanglement with the prosecutor, or fear of antagonizing the trial judge. It must be said ... that the language of [*Cuyler*] itself does not clearly establish, or indeed even support, such expansive application.... Both [*Cuyler*] itself and *Holloway [v. Arkansas,* 435 U.S. 475, 490–91, 98 S.Ct. 1173,

55 L.Ed.2d 426 (1978)], stressed the high probability of prejudice arising from multiple concurrent representation, and the difficulty of proving that prejudice. Not all attorney conflicts present comparable difficulties."

*Mickens,* 535 U.S. at 174–75, 122 S.Ct. 1237 (internal quotations omitted).

Nonetheless, in *Harris v. Carter,* 337 F.3d 758 (6th Cir.2003), the Sixth Circuit recently affirmed its pre-*Mickens* rule that: "This Circuit applies the *Cuyler* analysis to **ALL** Sixth Amendment conflict-of-interest claims." *Harris,* 337 F.3d at 762 (emphasis added) (quoting *Riggs v. United States,* 209 F.3d 828, 831 n. 1 (6th Cir.2000)). *But see Smith v. Hofbauer,* 312 F.3d 809, 815–16, 818 (6th Cir.2002). *Cf. McFarland,* 356 F.3d at 701; *Moss v. United States,* 323 F.3d 445, 460–61 (6th Cir.2003); Shiner, 60 *Wash. & Lee L.Rev.* at 994 & nn. 237–38. Further, the Sixth Circuit has not addressed a situation concerning a personal interest conflict since *Mickens.* Therefore, given the plain language articulated in *Harris* and absent contrary binding authority, the R & R correctly adhered to the pre-*Mickens* rule in the Sixth Circuit that the *Cuyler* standard applies to the personal interest conflict at issue in this case. *See Harris,* 337 F.3d at 762.

Additionally, the nature of the personal interest conflict in this case clearly demonstrates that the *Cuyler* analysis is appropriate and should be applied here. *See* R & R at 32–35. The rationale behind *Cuyler's* presumption-of-prejudice rule is (1) the high probability of prejudice arising from the conflict and (2) the difficulty of proving that prejudice. *See Mickens,* 535

U.S. at 175, 122 S.Ct. 1237. These two elements are present here. First, when an attorney is the subject of a criminal investigation by the same prosecutor who is prosecuting the attorney's client, there is a high probability of prejudice to the client as the result of the attorney's obvious self-serving bias in protecting his own liberty interests and financial interests. The liberty concern at issue is avoiding or minimizing imprisonment. The financial interests include avoiding disbarment and avoiding termination of the attorney's current representation of the client in question.[2] The high probability of prejudice in this situation distinguishes this personal interest conflict from the weaker personal interest conflicts listed in the dicta in *Mickens,* e.g., book deals. *See Mickens,* 535 U.S. at 174–75, 122 S.Ct. 1237. Second, such prejudice is difficult to prove because the client could be harmed by the attorney's actions or inactions that are known only to the attorney. In short, the personal interest conflict at issue presents comparable difficulties to situations involving concurrent representation conflicts. *See Mickens,* 535 U.S. at 175, 122 S.Ct. 1237.

Therefore, for all of these reasons, the *Cuyler* standard applies. Under *Cuyler,* prejudice is presumed, and the petitioner (1) must show that his counsel had an actual conflict of interest and then (2) must establish that the conflict adversely affected his counsel performance in representing him. *See Cuyler,* 446 U.S. at 349–50, 100 S.Ct. 1708; *Tyler v. United States,* 78 F.Supp.2d 626, 632 (E.D.Mich.1999) (Gadola, J.).

---

2. For instance, in this case, LaRene had a financial interest in his representation of Petitioner, and this representation would be subject to termination if LaRene's conflict was revealed to Petitioner. Thus, in preserving the current representation, a conflicted attorney is likely to take prejudicial actions to protect his own financial interests (e.g., continuing the representation) at the expense of the client's best interests (e.g., terminating the representation).

## B. Actual Conflict

■ There is no doubt—as the Court stated on the record at the objections hearing—that LaRene labored under an actual conflict of interest during his representation of Petitioner. *See Taylor v. United States,* 985 F.2d 844, 846 (6th Cir. 1993); R & R at 26–35; Gov't Objs. at 9–17. At the very least, LaRene knew of the Government's LaRene/Giacalone investigation as early as August 8, 1991, almost a year before Petitioner's trial.[3] The Government concedes this fact in its objections. *See* Gov't Objs. at 3. Further, the same prosecutor's office, the United States Attorney's Office for the Eastern District of Michigan in Detroit, was heading the LaRene/Giacalone investigation and prosecuting LaRene's client, Petitioner. Moreover, because LaRene was not indicted until after Petitioner's trial and LaRene knew he was under investigation, LaRene was faced with an uncertain situation with respect to his own criminal liability, i.e., not knowing when, how, or if, the Government was going to prosecute him. The Government even admits that its final decision to prosecute LaRene did not come until after Petitioner's trial—until sometime after August 6, 1992. *See* Gov't Objs. at 5–6. Thus, LaRene went to trial in Petitioner's case with his freedom and livelihood in the balance. It is the existence of this undeniable uncertainty regarding LaRene's own liberty and financial interests before and during Petitioner's trial and LaRene's knowledge of this uncertainty that gives rise to the actual conflict in this case. *See Taylor,* 985 F.2d at 846; *United States v. Levy,* 25 F.3d 146, 156 (2d Cir.1994); *Thompkins v. Cohen,* 965 F.2d 330, 332 (7th Cir.1992) (when "the criminal defendant's lawyer himself [is] under criminal investigation ... [i]t may induce the lawyer to pull his punches in defending his client lest the prosecutor's office be angered by an acquittal and retaliate against the lawyer."); *United States v. McLain,* 823 F.2d 1457, 1463–64 (11th Cir.1987); R & R at 26–35.

## C. Adverse Effects

■ Further, the R & R correctly found that LaRene's conflict of interest adversely affected his performance in representing Petitioner. *See Cuyler,* 446 U.S. at 349–50, 100 S.Ct. 1708; R & R at 35–50; Gov't Objs. at 17–26. The Court will briefly summarize the four adverse effects detailed in the R & R.

First, LaRene failed to pursue plea negotiations on behalf of Petitioner. *See* R & R at 39–42; *McLain,* 823 F.2d at 1464. Before his indictment, LaRene was aware that his potential criminal liability included tax charges related to unreported large cash payments from his clients. Thus, LaRene had an incentive to impede plea negotiations between the Government and Petitioner because Petitioner's cooperation would expose LaRene's own dealings including his solicitation of large cash payments from Petitioner. *See* R & R at 27–28 & n.16. As Petitioner states in his response to the Government's objections, LaRene had a personal interest in keeping Petitioner away from the Government "at all costs" because Petitioner possessed information harmful to LaRene. Pet'r Resp. to Objs. at 34.

Second, LaRene delayed Petitioner's trial to Petitioner's detriment. *See* R & R at 42; *McLain,* 823 F.2d at 1464. There were numerous postponements between Petitioner's indictment, November 11, 1990, and the start of Petitioner's trial, May 5, 1992. While LaRene was not sole-

---

**3.** Additionally, the Court notes LaRene may have had vivid knowledge about the LaRene/Giacalone investigation before Petitioner's trial due to the fact that the Scartozzi's SAR was wrongfully disclosed in April 1992.

ly responsible for all of the postponements, he played a central role in at least two lengthy adjournments in Petitioner's case. One, LaRene drafted a stipulated order adjourning trial from October 28, 1991, to December 5, 1991. *See* Pet'r Supp. Br. (Nov. 4, 2003) Ex. E. Two, LaRene filed an unopposed motion to adjourn trial from December 5, 1991, until April 1992, and this motion was granted. *See id.* Ex. F. Through these adjournments and by refusing to pursue a plea agreement for Petitioner, LaRene prolonged Petitioner's case, and, thereby, LaRene gained more time to attempt to dissuade the Government from prosecuting him [4] and delayed his own indictment. *See* R & R at 42; Pet'r Resp. to Objs. at 34–35; *McLain,* 823 F.2d at 1464 (conflicted counsel's best interests were served by prolonging his client's proceedings because it delayed counsel's own indictment). Further, the long delay between indictment and trial harmed Petitioner in that the Government was able to substantially strengthen its case by obtaining and developing additional witnesses primarily through the guilty pleas and cooperation of Petitioner's co-defendants. *See* R & R at 42; Pet'r Comp. Br. at 85, 98.[5]

Third, LaRene failed to zealously defend Petitioner's interests with respect to a violation of the Court's sequestration order by a key Government witness. *See* R & R at 42–45; *Rugiero,* 20 F.3d at 1392–94; *Rugiero,* 20 F.3d at 1395 (Merritt, J., dissenting). Rather than pressing the sequestration matter, LaRene pulled his punches on this salient issue and curried favor with the Government through his handling of the matter. *See* R & R at 44; *Rugiero,* 20 F.3d at 1394; Pet'r Resp. to Objs. at 36–37.

Fourth, LaRene—the target of the aforementioned news broadcasts during jury deliberations in Petitioner's case— was present during the Court's questioning of the jurors about the broadcasts and also asked some of the questions himself. *See* R & R at 45–50. As mentioned above, local news broadcasts on June 17, 1992, reported that LaRene was the subject of a federal criminal investigation. On June 19, 1992, after the jury had convicted Petitioner on count one, the Court proceeded to poll each juror individually and out of the hearing of the other jurors as to the reported verdicts. *See Rugiero,* 804 F.Supp. at 928. The Court asked each juror whether he or she had been exposed to the publicity regarding LaRene. *See id.* Many jurors acknowledged having seen or heard of the publicity, but each juror informed the Court that the publicity did not influence his or her decision. *See id.* Given what is now known about LaRene's criminal-liability situation at the time, his presence and participation in this

---

4. As noted by the Government in its objections: "LaRene retained the services of a prominent Washington, D.C. law firm which expended considerable efforts 'lobbying' to dissuade the Tax Division [of the Department of Justice] from seeking LaRene's indictment." Gov't Objs. at 13–14; *see also* Pet'r Resp. to Objs. at 35; Pet'r Comp. Timeline at 4–9.

5. Petitioner's co-defendant, Thomas J. Ahmed, pled guilty on July 24, 1991 pursuant to a Rule 11 plea agreement. On June 30, 1992, based upon the Government's downward departure motion, Ahmed was sentenced to 120 months. On October 19, 1995, Ahmed's sentence was further reduced to sixty months due to the Government's Rule 35 motion to reduce sentence. Petitioner's co-defendant, Robert Ricketts, pled guilty on July 31, 1991, pursuant to a Rule 11 plea agreement. On June 30, 1992, based upon the Government's downward departure motion, Ricketts was sentenced to forty-two months. Petitioner's co-defendant, Lonnie Jordan, pled guilty on August 1, 1991, pursuant to a Rule 11 plea agreement. On May 21, 1992, Jordan was sentenced to sixty months with the sentence to run concurrently with a state sentence that Jordan was serving at the time.

portion of the proceedings calls the reliability of the jurors' responses into question: LaRene had a personal interest in each juror stating that the broadcasts did not influence his or her verdict; thus, he manipulated the situation by being present and handled the questioning with an eye toward Petitioner not prevailing. *See* R & R at 46–50; Pet'r Resp. to Objs. at 38–40.

For these four reasons, LaRene's conflict of interest adversely affected his performance in representing Petitioner.

The Government points to an unpublished Fourth Circuit opinion that held that, when a defendant is "fully informed of [his counsel's] conflict" and has "an opportunity to hire other counsel," but elects to have that same counsel "continue to represent him at sentencing and on appeal," such "confidence in [his existing counsel] is ... proof that [the defendant] was not affected adversely by the alleged conflict." *United States v. Washington*, 46 Fed.Appx. 705, 706 (4th Cir.2002). This Fourth Circuit opinion is distinguishable. There is proof here, unlike the situation in the Fourth Circuit case, that Petitioner was adversely affected by LaRene's personal interest conflict, *see supra*, and the fact that Petitioner retained LaRene for his sentencing and his appeal does not outweigh or negate the four adverse effects previously discussed.

### D. Summary

Therefore, for all of these reasons, the *Cuyler* standard has been met: LaRene had an actual conflict of interest that adversely affected his performance in representing Petitioner. Thus, the R & R correctly concludes that the § 2255 motion should be granted.

In granting the § 2255 motion, the Court further concludes that the appropriate remedy is a new trial. *See* 28 U.S.C. § 2255; *Tyler*, 78 F.Supp.2d at 633 ("The Sixth Circuit has held that when a defendant has suffered a Sixth Amendment violation, the appropriate remedy is a new trial." (citing *Warner v. United States*, 975 F.2d 1207, 1214–15 (6th Cir.1992))). *See also* Pet'r § 2255 Mot. at 24 (prayer for relief: new trial). Here, conflicted counsel denied Petitioner a fair trial, and the appropriate remedy is a new trial free from the taint which plagued the initial trial.

Finally, the Court notes—as it did on a previous occasion when this Court granted a § 2255 motion—that:

> [t]he principle of adequate legal representation is fundamental to our system of justice. When the Constitutional right to legal assistance is violated, the prejudicial effects that follow from the violation should be vacated, set aside, or corrected. *See* 28 U.S.C. § 2255. Vacating and setting aside Petitioner's conviction here is not a punishment of society for the inadequacies of a lawyer but an attempt to redress unfair treatment of the accused. As the Supreme Court stated in *Brady v. Maryland*,

> > Society wins not only when the guilty are convicted but when criminal trials are fair; our system of the administration of justice suffers when any accused is treated unfairly. An inscription on the walls of the Department of Justice states the proposition candidly for the federal domain: "The United States wins its point whenever justice is done its citizens in the courts."

373 U.S. 83, 87, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). While it may be popular for detractors to criticize the courts for granting relief based on apparent "technicalities," defenders of our system of justice know that the rights guaranteed by the Constitution are never mere technicalities. Here, upholding those rights requires vacating Petition-

er's conviction and granting him a new trial.

*Tyler,* 78 F.Supp.2d at 633; *see also Mathis v. Berghuis,* 202 F.Supp.2d 715, 725 (E.D.Mich.2002) (Gadola, J.).

## V. CONCLUSION

ACCORDINGLY, IT IS HEREBY OR-DERED that the Government's objections are OVERRULED and the report and recommendation is ACCEPTED and ADOPTED as the opinion of this Court.

CONSEQUENTLY, IT IS FURTHER ORDERED that Petitioner's motion to vacate sentence pursuant to 28 U.S.C. § 2255 [docket entry 347] is GRANTED: Petitioner's conviction and sentence are VA-CATED and SET ASIDE, and a NEW TRIAL is ordered.

SO ORDERED.