**In re: Disciplinary Proceedings Governed by Rule 2.04(d), Rules of the Middle District of Florida, Arnold D. LEVINE, Esquire.**

**No. 85–43 MISC–T–10.**

United States District Court,
M.D. Florida,
Tampa Division.

Oct. 31, 1986.

---

Warren M. Goodrich, Petitioning Counsel, Tampa, Fla.

Arnold D. Levine, Tampa, Fla., pro se.

Before HODGES, Chief Judge, and MOORE and SHARP, District Judges.

## MEMORANDUM OPINION

This is a disciplinary proceeding instituted against attorney Arnold D. Levine, a member of the Bar of this Court. The matter is governed by Rule 2.04, M.D.Fla. Rules; and, pursuant to Rule 2.04(d)(2), has been heard and determined by a three-judge panel.[1]

We have concluded that the Respondent has engaged in misconduct in violation of the Disciplinary Rules of the Code of Professional Responsibility, and that he should be publicly reprimanded for that violation.

### I

Arnold D. Levine was admitted to the Bar of this Court on December 2, 1960. He later served for approximately two years as an Assistant United States Attorney and has since maintained offices in Tampa where he has continuously engaged in the private practice of law with emphasis on criminal defense work. He is an experienced trial lawyer, well known as such by the public and by his fellow members of

---

1. Judge Elizabeth A. Kovachevich initiated the proceeding by requesting an investigation by the Grievance Committee of the Tampa Division of the Court appointed pursuant to Rule 2.04(d), M.D.Fla.Rules. The Grievance Committee, following an investigation, made a probable cause report to the Court. In such circumstances the Rule contemplates that the United States Attorney will pursue the case by seeking an order to show cause. In this instance, however, the United States Attorney was disqualified by conflict of interest and independent counsel was appointed to prosecute the matter. The three judge panel was then convened under the Rule to conduct an evidentiary hearing and to decide the case.

the bar, and he has regularly appeared in this Court for many years in both civil and criminal cases.

## II

The events giving rise to this proceeding occurred in January, 1985, during a jury trial in the criminal case of *United States v. McLain,* Case No. 84–44 Cr-T–17, before the Honorable Elizabeth A. Kovachevich. Mr. Levine represented the principal defendant, Dennis McLain. The indictment was framed in multiple counts against several defendants, and the trial was both difficult and protracted. It began on November 19, 1984 and did not conclude until four months later on March 16, 1985.

Midway during the trial, on Tuesday afternoon, January 15, 1985, the Government called one Melvin Kaplan as a witness. Kaplan was a co-defendant in the case who had entered into a plea agreement with the Government and had consented to testify. During the pretrial proceedings Mr. Levine had learned of the existence of two tape recordings made by Kaplan of pertinent conversations between himself and one Todd Siegmeister who was also expected to be a subsequent Government witness. Kaplan's direct testimony was concluded in the late afternoon and Mr. Levine was to begin his cross examination the following morning. Before adjournment and with Kaplan still in the courtroom, Mr. Levine disclosed to the court his knowledge of the existence of the Kaplan/Siegmeister tape recordings and stated his desire to obtain possession of them for possible use during cross examination (and, presumably, for possible use during any subsequent examination of Siegmeister). Levine further explained that the tapes were in the possession of Daniel H. Foreman, a Miami attorney who had previously represented Kaplan in the case, and that Foreman was reluctant to surrender them, even if subpoenaed, absent a waiver by Kaplan of any privilege he might have, especially a work product privilege. A discussion then ensued as to whether Kaplan would make

such a waiver and whether he wished to consult his present counsel before doing so. There was also discussion about the procedure to be followed in having the tapes transported to the Court in Tampa. In the end the Court ruled as follows:

THE COURT: All right now, let's do it this way. Mr. Kaplan, if you will contact your new attorney and if he is not able to contact Mr. Foreman, I would request that you contact Mr. Foreman and discuss this topic of the tape. If there is a problem or if there is no problem, the best way to get these items up here is to have them sent up probably by the Eastern or Delta route, addressed to the Court and that way, they're coming up to the Court. Now, if arrangements are effectuate [sic.] for them to be picked up by a representative from Mr. Levine's office as an officer of the Court, we could perhaps arrange for that if it's coming up by plane tomorrow but, if it's addressed to the Court then there's no question about the fact that the Court is supposed to open it. I am not going to open them until we have got you here and we can hear argument about it.

At 7:30 a.m. the following morning,[2] Wednesday, January 16, 1985, Mr. Levine reported to the Court that he had spoken to Mr. Foreman on the telephone over the evening and had learned that the Kaplan/Siegmeister tapes were actually in the possession of an investigator, Wayne Black, but that Foreman was instructing Black to send them by air to Tampa "addressed to the Court." The Court then spoke directly to the witness, Kaplan, saying:

THE COURT: All right, sir, arrangements have been made, Mr. Kaplan for these tapes to come here by some mode of travel, probably a plane and, they are supposed to be at the Tampa Airport sometime today addressed to the Court. As soon as we find out when they arrive, we'll make whatever necessary arrangements we have to get the tapes here to the Courthouse then, we'll decide who

2. In an effort to expedite the trial, Judge Kovachevich had previously ordered that court

would be conducted from 7:30 a.m. to 5:00 p.m. each trial day.

opens them up, whether you open them up, whatever, so that you know that they've got into your custody and possession. We'll take it from there, okay, sir? Thank you. Fine, we'll leave it like that.

Later that morning, during Mr. Levine's cross examination of Kaplan, the following exchange occurred:

[By Mr. Levine]

Q. We had some proceedings out of the presence of the Jury late after they left yesterday and again this morning and I take it, so we have it on the record in their presence, you have waived any attorney/client privilege, work product privilege, any confidentiality of the work done by your investigator, Mr. Black, and particularly as it relates to these tapes; is that right?

[By Kaplan]

A. Yes.

The Court then excused the jury for lunch and inquired of counsel whether the subject tape recordings had arrived at the airport. Upon being told that they had not, further discussion ended with the following statement by the Court:

THE COURT: I'd appreciate each of you putting the comments on the record. The Court is trying to accommodate a number of things, not the least of which is the fact that this witness has been requested to waive the privilege with regard to getting those tapes up here. The Court is just trying to accommodate everybody in moving this case along. Now, if you need the Court with regard to this, fine, if you do. We are going to stand in recess until twelve forty by the Courtroom clock.

The examination of Kaplan as a witness resumed after lunch and continued until the late afternoon, Wednesday, January 16, 1985. Upon the completion of his testimony at 4:50 p.m., the following colloquy occurred:

THE COURT: No more re-re-direct, right? Any further need for this gentleman? May he be excused, counsel?

MR. LEVINE: Just so long as it's clear on the record regarding the waiver of any confidentiality or work product on the—

THE COURT: With regard particularly and specifically to the tapes alone. He is not waiving, again, his attorney/client privilege.

MR. LEVINE: We don't ask for that at all—

THE COURT: As that was stated previously. That's just about what it sounded like, Mr. Levine. I know you didn't mean to do that, with regard to the tapes alone, he is waiving his attorney/client privilege.

MR. LEVINE: I did in regard to the investigator. I didn't ask attorney/client, I was careful to make that distinction. I did ask a very broad question as it related to the investigator because his name has been interjected, purported harassment, purported commination, [sic] and I do plan on calling him. I didn't want to get into that bind.

THE COURT: Well, what you're asking, so that this can be now clarified at this point, and the previous question and answer is modified, with specificity, you're asking him to waive any privilege he has relative to one or two?

MR. LEVINE: Only Wayne Black, the investigator, only.

THE COURT: With regard to the tapes?

MR. LEVINE: And the tapes, sure.

THE COURT: There's two tapes. You had no objections to that, correct, Mr. Kaplan?

THE WITNESS: No, sir—no, ma'am.

THE COURT: No problem with that. Now, what about this investigator? You're requesting that he waive any privilege he might have with regard to the investigator?

MR. LEVINE: Yes, I'm making that request. He can discuss that matter with his attorney and advise us after the fact.

THE COURT: I think that would be appropriate.

MR. MUELLER: I think you would almost have to, because he couldn't pos-

**1316**

sibly know what his attorneys might have disclosed to the investigator. He couldn't make a knowingful waiver at this point.

MR. LEVINE: I agree with that. I don't insist, as long as he was going to be excused. I thought it would be an appropriate time to deal with it.

THE COURT: That's fine with the Court, sir.

THE WITNESS: Your Honor, my old attorneys won't talk to me, and the new one, I don't think he understands even who Mr. Wayne Black is, so what do I do?

THE COURT: Well, it would appear to me that perhaps Mr. Levine may wish to pursue that further with your former counsel and ascertain what accommodations, if any, might be effectuated in that regard. The Court requests your cooperation.

THE WITNESS: Thank you.

THE COURT: You're not discharged from your Subpoena. You're excused at this time. Thank you for coming.

You're on a standby basis, subject to recall. Thank you.

Later that same afternoon (Wednesday, January 16), at approximately 5:55 p.m., the package containing the tape recordings finally arrived at Tampa International Airport on a PBA Airline flight from Miami. A legal secretary employed by Mr. Levine had been monitoring the flights from Miami, pursuant to his direction, and she was there to pick up the package when it arrived and transport it to him at the courthouse. She obtained the package, and signed for it; and, due to the lateness of the hour, promptly telephoned Mr. Levine in his office for further instructions. She also wanted to report to him that the package, a large manila envelope, had been partially torn in transit and that the contents apparently consisted of eight tape cassettes, not two. Mr. Levine instructed her to bring the package to him, which she did, placing it in his hands that evening.

When the package arrived at the airport, and when it reached Mr. Levine, the face of the 10" x 15" manila envelope appeared (by reduced facsimile) as follows:

Notwithstanding the conspicuous admonition on the face of the envelope, and despite the fact that the package obviously contained more than the two Kaplan/Siegmeister tape cassettes he had anticipated, Mr. Levine enhanced the existing tear and dumped the contents of the envelope out on his desk. He then selected one of the cassettes, placed it in his office recording machine, and began listening to it. He immediately recognized that the conversation he could hear was between Kaplan and someone other than Siegmeister, so he called in his client, the Defendant McClain, to listen with him. McClain identified the unknown voice as that of one Barry Nelson, yet another co-defendant who had also entered an earlier plea of guilty and was expected to be a possible Government witness. Levine then proceeded to listen to all of the tapes (or portions of each of them); and also telephoned counsel for another defendant at the trial to come and listen to one of the tapes, which he did.

The following morning, Thursday, January 17, 1985, before leaving his office for Court, Mr. Levine left instructions with his secretary to seek out a technician who could enhance the auditory quality of the tapes (because some were largely inaudible); and he also directed her to telephone Mr. Black and determine precisely how many tape cassettes Black had enclosed in the envelope for transmission by PBA. When court resumed at 7:30 a.m., however, Levine made no mention whatsoever that the package of tapes had arrived; that it contained eight tapes, not two; that the tapes included Kaplan/Nelson conversations as well as Kaplan/Siegmeister conversations; that he had listened to all, or portions of all, the tape cassettes; that he was seeking enhancement of their auditory quality; or that he had shared the content of one of the tapes with counsel for a co-defendant.

The trial continued throughout the day. Sometime during the afternoon, having received the telephone inquiry from Mr. Le-

vine's secretary, investigator Black telephoned Judge Kovachevich's office to express alarm about the status of the tapes; and, at 5:15 p.m., the end of the day's proceedings, Judge Kovachevich raised the issue herself with Mr. Levine.

### III

The Grievance Committee of the Court, following its investigation of the circumstances, reported that there was probable cause to believe that Mr. Levine had been guilty of unprofessional or unethical conduct in violation of the Code of Professional Responsibility of the American Bar Association as adopted by this Court through Rule 2.04(c), M.D.Fla.Rules.[3] Specifically, the Committee reported a probable violation of Disciplinary Rules 1–102(A)(1), (2), (3), (4), (5) and (6), and 7–102(A)(3) and (8) when Mr. Levine opened the envelope which was clearly addressed to a judge of this court and conspicuously marked to be opened only by her; when he removed the contents of the envelope and listened to the tapes without authority of the sender; and when he failed for a period of more than twenty-three hours to apprise the court of his receipt of the envelope and his knowledge of the content of the tapes.

■ However, the petition for rule to show cause filed by independent counsel in consequence of the committee report does not precisely track, or incorporate by reference, the allegations of that report. Rather, the petition contains its own "specification of charges," and we have determined that to the extent those charges differ from the allegations of the committee report, the report has been superseded and the case should be decided on the basis of the charges made in the petition.

The petition alleges that Levine violated DR 1–102(A)(1), (2), (3), (4), (5) and (6) of the Code by (A) opening a package which was clearly labeled that it was to be opened only by the presiding judge; (B) opening a

---

**3.** Rule 2.04(c) adopts the Code of Professional Responsibility in the slightly modified form approved by the Supreme Court of Florida governing the professional behavior of members of the Florida Bar. The Florida modifications involve portions of the Code which are not involved in this case.

package which had been the subject of a specific order directing Levine to acquire possession of the package as an officer of the court and to deliver it to the court; and (C) obtaining through guile possession of property of a co-defendant.

Canon 1 of the Code of Professional Responsibility provides that: "A lawyer should assist in maintaining the integrity and competence of the legal profession." Disciplinary Rule 1–102, promulgated under Canon 1 and cited in the petition, provides as follows:

DR 1–102. Misconduct

(A) A lawyer shall not:

(1) Violate A Disciplinary Rule.

(2) Circumvent a Disciplinary Rule through actions of another.

(3) Engage in illegal conduct involving moral turpitude.

(4) Engage in conduct involving dishonesty, fraud, deceit, or misrepresentation.

(5) Engage in conduct that is prejudicial to the administration of justice.

(6) Engage in any other conduct that adversely reflects on his fitness to practice law.

### IV

■ In essence, therefore, the first issue to be decided is whether there is clear and convincing evidence [4] that Mr. Levine committed a dishonest act (DR 1–102(A)(4)), or engaged in conduct that was prejudicial to the administration of justice (DR 1–102(A)(5)), or engaged in conduct that adversely reflects on his fitness to practice law (DR 1–102(A)(6)), when he opened a package which was conspicuously marked that it was to be opened only by Judge Kovachevich.

The facts as previously recited in this opinion are virtually undisputed. Mr. Le-

vine does not deny that he received the envelope in his office; that it was labeled and marked as depicted above; and that he nevertheless opened it and listened to the contents. Rather, he seeks to justify his opening of the envelope on the basis that Kaplan had waived any evidentiary privileges he may have had; that the Government had expressed a lack of interest in the tapes; that he and other lawyers present during the relevant judicial proceedings formed the impression by lunchtime on Wednesday, January 16, 1985, after Kaplan's waiver, that Judge Kovachevich had abandoned any expectation she may have had that the package would be brought to and opened by her; and that he, Levine, reasonably believed under all of those circumstances that he had the authority to open the package and listen to the tapes as he did.

In our opinion, however, none of these circumstances justify or satisfactorily explain what was done. With respect to Judge Kovachevich's continuing expectation that the package was going to be brought to and opened by her, the record is at best ambiguous and offers little support for Levine's position. With respect to Kaplan's waiver of evidentiary privileges, the record is also less than clear; but, in any event, such a waiver extended only to the Kaplan/Siegmeister tapes, not the Kaplan/Nelson tapes, and Mr. Levine certainly knew the moment he handled the envelope that it contained more than anyone had anticipated. Moreover, the circumstances surrounding the transmission of the envelope render any waiver by Kaplan largely irrelevant. The Package was sent to the Court by Black, not by Kaplan; and Black had his own privilege—or, more accurately, an obligation of confidentiality—with respect to which he clearly expected a judicial ruling absolving him of any responsibility for disclosure of the tapes.[5]

---

4. The Florida rule, which we adopt, requires clear and convincing evidence in attorney disciplinary proceedings. *The Florida Bar v. Rayman*, 238 So.2d 594, 596–597 (Fla.1970); *accord, The Florida Bar v. Hipsh*, 441 So.2d 617, 618 (Fla.1983); *The Florida Bar v. Ragano*, 403 So.2d 401, 404 (Fla.1981); *The Florida Bar v. McCain*, 361 So.2d 700, 706 (Fla.1978).

5. Florida Statute 493.32 (1985) makes it a criminal offense, a second degree misdemeanor, for any licensed private investigator to "divulge or release to any person, other than to his principal or his employer, any information acquired as a result of any investigation … [except for] the taking of testimony or the receiving of evidence in any judicial proceeding."

The stark fact is that a lawyer received an envelope that was not only addressed to a judge of this court, but was also clearly and conspicuously labeled that it was to be opened only by her, and the lawyer nevertheless proceeded to open that envelope without express permission or direction from the judge to whom it was addressed. This was clearly conduct in violation of DR 1–102(A)(4), (5) and (6), and requires disciplinary action.

■ In mitigation of the seriousness of this conduct, Mr. Levine urges that he was grossly fatigued at the time in question due to the onerous daily trial schedule; that he acted in subjective good faith; that he has an unblemished reputation with respect to honesty and integrity; that his actions were calculated to promote, not suppress, the search for the truth during the trial; and that, indeed, all of the tape recordings contained in the envelope—both the Kaplan/Siegmeister as well as the Kaplan/Nelson tapes—were subsequently determined to be properly discoverable by the defense and were, in fact, received in evidence by the court. While none of these circumstances justify or excuse Levine's behavior, we agree that they do tend to mitigate the seriousness of his acts and should be taken into account in fashioning the appropriate disciplinary penalty to be imposed.

### V

Accordingly, it is our judgment that a public reprimand, as distinguished from a more severe sanction, is the appropriate discipline in this case;[6] and such public reprimand shall be accomplished by publication of this opinion at the appropriate time.

The Clerk is directed to file this opinion *in camera* pursuant to Rule 2.04, M.D.Fla. Rules, and to withhold publication pending any timely appeal. In the absence of an appeal or upon receipt of a mandate of affirmance by the Court of Appeals, this opinion shall be placed upon the public records of the Court and otherwise released for general publication.

IT IS SO ORDERED.

---

6. Because we have concluded that the first charge made in the petition is supported by clear and convincing evidence, and that a disciplinary sanction is required, it is unnecessary to address charges two and three since they are predicated upon the same factual matrix. We would observe, however, that charge three, alleging the acquisition of property of a co-defendant through "guile," is not supported by the evidence.