Ernst Mueller, Asst. U.S. Atty., Jacksonville, Fla., for plaintiff.

Thomas Hanlon, Tampa, Fla., for defendant.

**UNITED STATES of America,**

v.

**Dennis McLAIN.**

**No. 84–44–CR–T–17.**

United States District Court,
M.D. Florida,
Tampa Division.

Dec. 15, 1988.

## ORDER ON MOTION TO RECUSE

KOVACHEVICH, District Judge.

This cause is before the Court on motion to recuse filed by Defendant on July 26, 1988 and response thereto.

Defendant was tried before this Court and convicted on March 16, 1985, on all but one count of the indictment. On April 26, 1985, the Court sentenced Defendant as follows: Count 1–eight years, Count 2–eight years concurrent with Count 1, Count 3–eight years concurrent with Counts 1 and 2, Count 4–fifteen years consecutive to Counts 1, 2, and 3.

On August 7, 1987, the Eleventh Circuit Court of Appeals reversed Defendant's conviction and remanded for a new trial. *U.S. v. McLain,* 823 F.2d 1457 (11th Cir. 1987). In that opinion, the appellate court found that the discipline and decorum of Defendant's trial unraveled and that the case was a "classic example of judicial er-

ror and prosecutorial misconduct combining to deprive the appellants of a fair trial." That court delineated the actions of this Court which it concluded supported these findings. The cited problems included:

1. The Judge became increasingly agitated, about the pace at which the trial was proceeding, when it became clear, shortly after the trial commenced, that the time allotment of eight weeks was an insufficient estimate of the trial time. The judge constantly reminded the attorney's to pick up the pace and had the courtroom clerk clock the attorneys and periodically announced the time that had passed for each attorney. [Appellate courts regularly "clock" attorneys in proceedings before them.]

2. When the trial did not speed up satisfactorily, the trial judge "carried out her threat" of extended session and commenced trial at 7:30 a.m. and ended at 5:00 p.m., Monday through Thursday. The trial court followed this schedule from December 3, 1984, until January 23, 1985. [(This was a little less than two months out of the four month trial). The appellate court found that the four day week, nine and a half hour days (including lunch and other recesses) to be an "excruciating trial schedule", which reduced the effectiveness of the jury and had a serious effect on the attorneys' ability to stay alert and provide adequate representation for their clients.]

3. The reduction of the jury's effectiveness was evident from the following: a) the jury became restless and inattentive; b) the judge allowed the jury to stand during breaks in the testimony; c) eventually the jurors were allowed to stand during the attorney's examinations; d) the marshals were instructed to observe the jury to "prevent their slumber"; e) food and coffee were available to the jury in the jury box [The courtroom environment was appalling and beyond control; the atmosphere ranged from frigid to sweltering, simultaneously, in varying locations. Many jurors and defendants were ill with colds, requesting fluids, lozenges, and other courtesies from the trial court, which they received.] and f) there were complaints of jurors sleeping. [The one juror who was perceived as sleeping by the Court was discharged before the jury began deliberations.]

Defendant's motion to recuse is based on several reasons which he contends support the request to have this Court recuse itself from further proceeding in this cause. First, Defendant refers to the opinion cited above from the Eleventh Circuit Court of Appeals; this opinion, Defendant asserts, "severely criticized" this Court's conduct of Defendant's trial and is an opinion that is "completely devoid of any praise or approval."

Defendant submits further that the disparity in the sentences received by the Defendants who went to trial, thereby consuming four months of this Court's time and causing a backlog on its docket, clearly demonstrates this Court's "bias and prejudice" against the Defendants that proceeded to trial. Defendant suggests that the resentencing of co-Defendant Sher supports this contention.

Defendant's retrial was estimated by the parties to take six to eight weeks. Defendant asserted that the estimated trial time confronted this Court again with an overcrowded docket and a protracted trial. Based on the Court's prior efforts under similar circumstances "magnified by the highly critical opinion" of the appellate court, Defendant asserts that "any reasonable" person would question the Court's impartiality based on the totality of these circumstances.

Defendant's second major assertion in support of the motion to recuse is that this Court received a copy of a chapter of a book and a portion of a movie manuscript about Defendant and his trial. The mailings, according to Defendant, are "very critical" of this Court and the conducting of his trial. (Copies of these submissions are attached to the motion to recuse and therefore for the first time became part of the public record in this cause.) After investigation, it was concluded that Defendant had not been the source of the material which this Court received.

Defendant asserts that the mailing of the material was intended to "bias and prejudice" the Court and that any reasonable person, under the circumstances, would question this Court's impartiality regarding Defendant, in light of the critical nature of the submitted materials. (This Court, as it has previously stated, has never reviewed the materials in question. Upon receipt in chambers, and as soon as the Court discerned what the materials were, the Court had the materials filed *in camera*, without reading or reviewing in any manner those materials except the initial cursory examination upon opening the envelope to ascertain its contents.)

Upon request of Defendant's counsel, this Court set a deadline of February 1, 1988, for filing any motion to recuse. The instant motion to recuse was not filed until July 26, 1988. Point A of the motion to recuse discusses the appellate opinion remanding the case and the perceived sentencing disparity as a basis requiring recusal. All of the points made by Defendant in this part of his motion were available to be made in accordance with the Court's original deadline for filing a motion to recuse. The Court feels that this portion of the motion could be denied for failure to raise them in a timely manner. However, considering the nature of the allegations, the Court has decided to address the merits of this portion of the motion to recuse.

On October 18, 1988, one week prior to the scheduled new trial of the Defendant, Dennis D. McLain was rearraigned pursuant to a plea agreement that he signed on October 18, 1988, and presented himself before the Court for the purpose of entering a change of plea pursuant to that plea agreement. The Defendant, McLain, entered a plea of guilty to Counts One and Four of the indictment. In Count One the Defendant is charged with conducting an enterprise engaged in racketeering activity and the collection of unlawful debts, in violation of 18 U.S.C. § 1962(c). This offense carries a maximum penalty of 20 years imprisonment, a $25,000.00 fine, or both. In Count Four the Defendant is charged with possessing, with intent to distribute, a quantity of cocaine. The maximum penalty for this offense is 15 years imprisonment, a $25,000.00 fine, or both, plus, in the event a sentence of imprisonment is imposed, a minimum special parole term of three years.

The essential elements of the offense charged in Count One are: first, that the Defendant was associated with an "enterprise" as defined in 18 U.S.C. § 1961(4); second, that the Defendant knowingly and willfully participated in the collection of an "unlawful debt" as defined in 18 U.S.C. § 1961(6), or alternatively, that he committed two offenses which constitute a "pattern of racketeering activity" as defined in 18 U.S.C. § 1961(5); third, that in collecting the unlawful debt or committing the two offenses which constitute a pattern of racketeering activity, the Defendant participated in the affairs of the enterprise; and fourth, that the enterprise was engaged in, or its affairs affected, interstate commerce.

The essential elements of Count Four are: first, that the Defendant McLain knowingly and willfully possessed cocaine as charged; and second, that he possessed the substance with the intent to distribute it.

The Defendant McLain and the United States of America agreed that in the event sentence of reincarceration is imposed with respect to Count One, said sentence of incarceration shall run concurrently with any sentence of incarceration imposed on Count Four; further, inasmuch as the Court imposed a sentence of eight years imprisonment on Count One following the prior trial in this case, that absent special findings, the Court cannot impose a sentence of incarceration in excess of eight years with respect to Count One. Similarly, since the Court did not impose a fine following the prior trial, it is the understanding of the parties that, absent special findings, the Court cannot impose a fine on either count One or Count Four. With respect to Count Four, the parties agree that in the event the Court imposes a sentence of incarceration, that said sentence shall not exceed twelve years, and that said sentence of incarceration shall run concurrently with any sentence of incarceration imposed on Count One. No sentencing limitations oth-

er than those set forth above were placed on the Court by this agreement. In essence, the parties agreed to a sentencing "cap" of twelve years incarceration upon the Defendant, with credit for time already served.

At the time of the sentencing, the United States will move for dismissal of Count Two and Count Three of the Indictment; the United States will also dismiss the forfeiture allegations contained therein regarding the forfeiture of $8,000.00 and another forfeiture of $900.00.

In the event that the Court imposes a sentence of incarceration, absent new or extraordinary circumstances not known at the time of the rearraignment, the Defendant shall be allowed to report on his own, as opposed to being transported by the U.S. Marshal to the institution to which he is designated and shall remain on the same bond under the same conditions as at present.

Further, to the extent that there are inconsistencies between the stipulated facts, set forth below, and the testimony of the Defendant at the prior trial in this case, the United States agreed that it will not prosecute the Defendant for false statements of perjury contained in his previous testimony in the trial of this case. As to the voluntaryism of the Defendant's actions by entering this change of plea, the Defendant acknowledged that he entered into this agreement and plead guilty freely and voluntarily without reliance upon any discussions between the attorney for the government and the Defendant and his attorney and without promise of benefit of any kind other than the concessions contained in the Plea Agreement, and without threats, force, intimidation, or coercion of any kind. The Defendant further acknowledged his understanding of the nature of the offense or offenses to which he is pleading, and the elements thereof, including the penalties provided by law, and his complete satisfaction with the representation and advice received from his counsel. The Defendant also understood that he had the right to persist in his plea of not guilty, and that he had the right to be tried by a jury with the assistance of counsel, the right to confront and cross examine the witnesses against him, the right not to be compelled to incriminate himself and the right to compulsory process for the attendance of witnesses to testify in his defense; but by pleading guilty he waived or gave up those rights and there will be no trial. The Defendant further understood that if he pled guilty, the Court could ask him questions about the offense or offenses to which he pled and if he answered those questions under oath on the record and in the presence of counsel, his answers later could be used against him in a prosecution for perjury or false statement. The Defendant also understood that he will be adjudicated guilty of the offenses to which he pled and if any of such offenses are felonies, he may thereby be deprived of certain rights such as the right to vote, to hold public office, to serve on a jury, and to have possession of firearms.

*The Defendant McLain certified that he knowingly and voluntarily admitted the truth of the stipulated facts, which follow herein:*

"From 1978 through 1982, First Fidelity Financial Services (hereafter FFFS), a Florida corporation located in Hollywood, Florida, was engaged in the business of equity mortgage lending. Stanley Seligman was president of FFFS for part of this period. Barry Nelson was vice-president. Seymour Sher was an investor in the business and a close associate of Barry Nelson. Frank Cocchiaro, through Sher, invested funds in FFFS, although these were in the name of his long term live-in companion, Mafalda Kline. Dennis McLain, in the summer of 1980, began operating the Tampa office of FFFS, called Tampa Equities, which was controlled half by FFFS and half by McLain. For part of this period, FFFS had an office in Sarasota operated by Richard Schwartz. The affairs of FFFS affected interstate commerce.

"In October 1980, Dennis McLain handled a $208,000.00 FFFS loan involving a second mortgage for an individual named Dan Cowart, who was in the restaurant business. The property which was to be the collateral for the second mortgage was a parcel located in Sumter County, Florida.

McLain explained to Cowart that prior to obtaining the loan, he (Cowart) would have to pay a cash kickback to Seligman prior to receiving the loan. Cowart testified that if he did not pay the cash kickback, his loan would not be approved. During his and Mr. McLain's conversation concerning the cash kickback, McLain consulted with Stanley Seligman who agreed to reduce the amount of cash kickback from $12,000.00 to $10,000.00. Thereafter, Stanley Seligman agreed to have the kickback lowered to $7,000.00. Coward was notified by McLain that $7,000.00 would be a sufficient amount.

"When the check for the $90,000.00 proceeds was disbursed to Cowart, Cowart cashed it and gave $7,000.00 to Dennis McLain to be paid to McLain, Seligman, and others. This October, 1980, payment of $7,000.00 in cash was never shown on any loan document as having been paid to First Fidelity or any of its representatives.

"In 1980, Dale Sparks was operating a disco in Sebring, Florida, and had leased a movie theatre in Deland which he was also trying to convert into a disco. He obtained a $145,000.00 loan from FFFS in January 1981 through Richard Schwartz who operated the Sarasota FFFS office. He ran out of money in March 1981, and was referred by Schwartz to Dennis McLain, who arranged for Sparks to get a $40,000.00 cash loan through Sher. The interest was to be $1,000.00 per week, and repayments of principal were to be in an amount of not less than $10,000.00, the first such repayment due in eight weeks. This was an interest rate of 130% per year. The maximum legal interest rate for this type of loan was 18% per year. Sparks received this loan on March 27, 1981.

"Sparks made eight payments of $1,000.00 to McLain. At that point, in late May 1981, Sparks was told to meet with McLain and Sher in Ft. Lauderdale. Sparks was current on his weekly $1,000.00 payments when this meeting occurred, but did not have the first of his $10,000.00 principal repayments. As a result of this, he was threatened with physical harm by Sher, in McLain's presence.

"On August 27, 1981, Sparks met with McLain and Sher in Tampa, and was again threatened with physical harm by Sher if he did not come up with more money. They told Sparks to rob, steal, sell dope, or do whatever it took to raise money.

"On November 10, 1981, McLain arranged with Sparks to come to Ft. Lauderdale two days later to discuss Sparks' loan shark loan. On this occasion, Sparks was introduced to the General by McLain and Sher. The General, Frank Cocchiaro, in McLain and Sher's presence, informed Sparks that it was his $40,000.00 Sparks had borrowed, that Sparks still owed the money, that he should utilize any necessary means, whether criminal or not, to get it, and that if he didn't, Sparks would be physically harmed in various ways.

"John Paul Higgins was a Tampa mortgage broker who, in late 1980, had obtained an FFFS second mortgage in the amount of about $33,000.00 through McLain. In Spring 1981, Higgins sought a further loan from McLain. McLain arranged for Higgins to get $15,000.00 in cash from Sher, who met Higgins in Ft. Lauderdale. Higgins had to pay $450.00 per week in interest on this loan to McLain, a rate of 3% per week or 156% per year. The maximum legal interest rate for a loan of this type was 18% per year.

"Higgins paid the $450.00 per week for about 3 months, and repaid the $15,000.00 in cash in early August. He obtained the $15,000.00 to repay Sher by opening a new commercial bank account at Florida First National Bank together with a business associate. A $17,000.00 check, which was bad, but took some days to get back to the bank, was written against the account. $15,000.00 of this $17,000.00 was used by Higgins to repay the loan to Sher. On the strength of the repayment, Higgins, through McLain, persuaded Sher to lend him another $30,000.00. This again was cash received in Ft. Lauderdale by Higgins from Sher. The interest rate was the same, 3% per week, a payment of $900.00 per week. Higgins received the money from Sher on August 12, 1981. He immediately wired $26,500.00 of it to the First

Florida National Bank, which was still holding the $17,000.00 bad check written on the new account, which was then paid.

"Shortly after Higgins obtained the $30,-000.00 loan, his business partner, Johnson, absconded. Higgins made one $900.00 weekly payment to McLain, and the following week told McLain he couldn't pay. Thereafter McLain informed Higgins that neither Higgins nor his family would be safe if Higgins didn't pay.

"In early September, per instructions from McLain, Higgins and his wife quit-claimed their house to McLain. Higgins had a first mortgage of about $30,000.00 on it, and a second mortgage of about $33,000.00 to FFFS.

"McLain instructed Higgins and his family to vacate the home that they had quit-claimed to him. Before they left, McLain on one occasion entered the house, looking for Higgins. On this occasion, he told Mrs. Higgins to tell her husband that no one in her family would be safe, not even 'Notre Dame' (a reference to a son in college), if the money was not paid.

"After Sparks and Higgins failed to pay the principal on the $40,000.00 and $30,-000.00 loans, respectively, Cocchiaro and Sher told McLain that he was ultimately responsible for repaying these loans.

"In September 1981, McLain was operating a sports bookmaking operation in Tampa in association with Sy Sher. He met a former golf pro named Larry Madison, from St. Petersburg, who collected bets for a number of sports bettors for another bookmaking operation. Sher, McLain, and Madison agreed that Madison would join the Sher–McLain bookmaking operation if Madison brought his bettors with him. Madison would get one third of his bettors' net losses to the operation and continue to handle collections from his group. This arrangement was agreed to, and Madison worked for McLain and Sher until shortly after the end of the professional football season (early February 1982). Madison had about nine bettors who bet anywhere from $1,000.00 to $10,000.00 each, per week. McLain also had his own group of bettors. The wagers, in each instance, were called by the bettors to telephones operated under Sher's supervision in the south Florida area. After the results were tabulated by Sher's people, collections were made and winnings paid by Madison and McLain. The net proceeds due Sher were delivered in cash via air flight by one of McLain's employees to Sher on a weekly basis.

"In October 1981, one bettor, Robert Thomas lost $10,000.00 in sports wagers in a single weekend. He could not pay the money and went into hiding to avoid paying the gambling debt. Madison, McLain, and Sher met with Thomas' business partner, Larry Schmalholtz, in an effort to collect the money. After the meeting, Schmalholtz went to Thomas' parents and persuaded them to pay their son's $10,000.00 gambling loss. The payment took the form of two $5,000 checks payable to Schmalholtz, but were cashed in First Fidelity Financial Services' bank account.

"In February 1982, McLain and an associate named Felix Bertucci, who ran a business called Executive Realty in Tampa, used Bertucci's offices to take sports wagers. The nature of McLain's bookmaking business changed at this time since the wagers were being taken in Tampa, rather than being called to Sher's people in south Florida. Madison, McLain, and Bertucci all participated in taking the bets. This phase of the operation ended after about a month, at the end of February 1982, when a bettor won a large wager which McLain and Bertucci couldn't pay.

"FFFS was shut down by order of the Comptroller's office of the State of Florida on April 2, 1982. With Bertucci's help, McLain leased a twin engine turbo-prop Cessna Cheyenne in mid-June 1982. About the same time, Barry Nelson informed McLain that he knew an individual who could sell cocaine for them, Todd Siegmeister, from the Elizabeth, New Jersey area. At McLain's request, Nelson introduced McLain to Siegmeister. This meeting occurred in mid-June, and Siegmeister was put on standby to come to get cocaine when it was available.

"Later that month, on June 26, 1982, McLain was introduced by Larry Knott, a

co-defendant, to Jim Pritchett. Pritchett agreed to 'front' McLain three kilos of cocaine. McLain was furnished the three kilos by Pritchett in the Ft. Lauderdale area on the morning of June 28, 1982. The cocaine was placed in golf bags, and taken by McLain and Knott to the Cessna Cheyenne at the Ft. Lauderdale airport, where Siegmeister, his girlfriend, and Mel Kaplan, an associate of Nelson's were waiting. The golf bags were loaded on the Cheyenne and flown to Newark, New Jersey, where Siegmeister attempted to sell it. This effort was unsuccessful. After confirming that the cocaine wasn't sold, McLain directed Siegmeister to return it to Florida, and it was flown back on the Cessna Cheyenne.

"Upon arriving in Ft. Lauderdale on June 30, 1982, McLain and others registered under phony names at the Turnberry Country Club with the cocaine, while deciding what to do next. McLain finally agreed to let Siegmeister and an associate take the cocaine back to New Jersey to sell it. Siegmeister departed Florida by train on this occasion, arriving in New Jersey on July 4. During the course of the trip, half of the three kilos was lost or stolen. This prompted McLain to fly to New Jersey to meet Siegmeister to determine the responsibility for the loss and what to do with the rest. McLain decided to let Siegmeister and an associate of Siegmeister's named Jerry Mendelson sell the rest.

"Later, on July 16, 1982, with much of the remaining cocaine still unsold, Siegmeister returned the balance of the cocaine, around two to three pounds, to McLain in Tampa. Siegmeister and Mendelson stole about eight ounces of the remaining cocaine just before turning the rest over to McLain and Bertucci. The cocaine that was returned was sold by McLain and Bertucci over the next few weeks.

"About mid-July, McLain arranged a second cocaine transaction involving 10 kilos. He sent Felix Bertucci to West Palm Beach to meet with two of Jim Pritchett's men on July 19, 1982. After waiting at a Holiday Inn almost two days, Bertucci met with two individuals who had 10 kilos of cocaine with them. Bertucci drove to Brandon with Pritchett's men and the 10 kilos. On McLain's instructions, Bertucci and Pritchett's men took a sample of the cocaine to the office of Dr. John T. Greene in Tampa on the evening of July 21, 1982, and it was given to Greene. Thereafter, however, the transaction was not consummated because the buyers, several persons who had come to Tampa from Texas, had not waited for the cocaine, which had been late in arriving. Pritchett's men thereafter returned the cocaine to south Florida."

This Court additionally advised Defendant McLain that he was waiving his rights to appeal the charges in this case and other matters, that he retained his right to question the jurisdiction of this Court, but other than that, he was waiving his appeal rights herein, which he acknowledged.

After all of the foregoing discussion, this Court accepted this plea agreement, and adjudicated the Defendant guilty of the charges in Count One and Count Four of the Indictment. Even though the Defendant waived his appeal rights on the charges and other matters, due to Defendant's retention of rights with regard to the jurisdiction of this Court and the propriety of this Court proceeding forward with the sentencing in this case, this Court deals with this matter so that it does not constitute any cause why sentence should not be imposed on the Defendant McLain, as it is now currently scheduled for December 15, 1988.

In the Government's response to the Defendant's motion to recuse, the Government systematically deals with Defendant's assertions regarding the recusal of this Court. First, the deadline for filing the motion to recuse was February 1, 1988. Counsel for the Defendant, in December 1987, had asked for approximately two weeks within which to decide to file such a motion, but was given over a month to do so. No motion to recuse was filed. Finally, in late July, 1988, six weeks before a scheduled trial date, and six months late, a motion to recuse which discusses principally the appellate opinion in this case, was filed. The timing suggests that the true purpose of the motion was not really to cause the Court to recuse itself, but rather,

either to delay the trial, by causing it to be transferred to another judge, or, alternatively, to influence prospective rulings of the Court and cause the Court to lean in the Defendant's favor and to be "fairer than fair", in response to the assertions of bias. The Government asserts that given the total lack of substance to the motion, the Court should not allow the Defendant to accomplish either of these objectives.

Further, the Government points out that it has no idea why the motion to recuse discusses the Court of Appeals' opinion in this case in such great length; "Impartial observers of the trial of the case have commented to the Government's attorney that were it not for the name of the case, they could not have recognized it as the same case they saw from the Court of Appeals' written opinion. There was an atmosphere of dignity and seriousness in the Courtroom throughout the trial except on the few occasions when intentional disruptions occurred, such as the instance when one defense counsel was waving a golf club around in front of the jury while he was examining a witness regarding purported testimony that occurred while persons were playing golf. The conclusion that conducting a trial for 32 hours a week, during approximately two months of a four month trial, somehow in itself amounted to an abuse of discretion, is acknowledged by almost anyone knowledgeable to be absurd, because it is well known that many judges, including former district judges presently serving on the Court of Appeals, have frequently run their weekly trial schedules that long or longer, and that this is not an unduly long or heavy schedule."

The Government's response notes that the Court of Appeals' comment, at 823 F.2d at 1461, that counsel for McLain asked "incredulously" at one point whether the Court wanted him to proceed, illustrated the approach of the Court of Appeals in the case. No one in the Court of Appeals was there to hear the tone of voice of counsel for McLain, and accordingly the Court of Appeals had no basis for stating that the question was asked "incredulously." In truth, all such inquiries which the Government prosecutor recalled were made in a matter-of-fact tone. And the comment made by the Court that the case had better go to the jury by the week of March 12, or there would really be a show the week of March 18, was nothing more than a reference to the fact that many other matters were scheduled in that courtroom that following week, and had no connotations beyond that.

The Government concluded by commenting that all of the foregoing simply shows that the Court of Appeals' opinion was result oriented and that the Court of Appeals did not conduct a complete review of the extremely voluminous record in the case (twenty-five thousand pages); regrettably, the Government observed when there is such a disparity between the reality of a trial and the conclusions set forth by the Court of Appeals, it tends to bring the Court of Appeals into disrepute.

In any event, at this point, all of the foregoing is water over the dam. It furnishes no ground or reason why this Court should recuse itself. The Defendant's motion sets forth no nexus between the opinion and the request for recusal.

The Defendant's suggestion, contained within Point A, that Cocchiaro, Sher, and McLain received heavy sentences just because they were involved in a long trial before the Court is fatuous and amounts to nothing more than unfounded speculation of the worst sort. The Court heard far more about the crimes committed by these defendants, in far greater detail, than it did about any of the other defendants who pled guilty, including, evidence of threats of violence and abuse of the victims of the defendants, which alone furnished a basis for heavier sentencing for them. Each of these defendants, in addition, was charged in more counts, and thus with more crimes, and convicted of more crimes than any of the defendants who pled guilty.

The Defendant does not even address the contents of the presentence investigations, which undoubtedly figured in the sentences of the respective defendants, nor the arguments made in the United States' Sentencing Memorandum filed with respect to the three defendants who went to trial. For these reasons, and the others set forth

above, it is obvious that the suggestion that this Court had improper motivation in sentencing the defendants who went to trial amounts to unwarranted pressure that the Court should not endorse, nor should it give credence to such a smear by recusing itself from the case.

The Defendant asserts that the Court should recuse itself because it received in the mail proof sheets allegedly from McLain's then prospective book. The Court has already made it plain, on the two occasions when these proofs have been discussed, that the Court did not read the material beyond looking at it to ascertain what it was. Thus, no basis for recusal predicated on these proof sheets exists.

The fact that defense counsel has made it known to the Court that the proof sheets contain material which is critical of both the Judge and prosecutor, is neither here nor there. Neither courts nor prosecutors expect to be liked by defendants. That does not mean that defendants who show their dislike will be treated unfairly.

In sum, the Court must not entertain the prospect of recusing itself because of the anonymous mailing. Otherwise, anybody who wanted to engage in "judge shopping" could simply cause material to be mailed to a Court anonymously in order to succeed in such a project. This Court, surely, does not want to set a precedent for recusal under such circumstances.

Counsel for the Defendant, Thomas Hanlon, Esquire, has made it known to the Court, on the record, that he thinks the Court can be fair and would be fair in this case, and thus has admitted that no factual predicate exists for the Motion to Recuse. Thus, he has filed a motion on behalf of his client, at his client's request, which he has stated, has no merit.

Following the June 15, 1988 hearing at which these comments were made, the Government prosecutor Ernst Mueller stated that he spoke with Arnold Levine, Esquire, McLain's former counsel, who remarked, in effect, that the defense had gotten favorable treatment during the previous trial; Mueller asked, predicated on this, why the defense would want to recuse the judge. Levine's response was, to the effect: you know that [about the favorable treatment]; I know that, but the Court of Appeals doesn't know that. Thus it appears, both from Levine's previous failure to file a timely motion to recuse, when the deadline for same had been established, and from the above-described comment, that Levine also believes the motion to recuse has no merit.

On March 27, 1986, this Court conducted proceedings in this case, on limited remand from the Eleventh Circuit Court of Appeals, regarding the assertions of Defendant McLain's co-defendant, Seymour Sher, that he had been deprived of effective assistance of counsel. Evidence elicited in that hearing pertained to the conduct of Defendant McLain's trial counsel, Arnold Levine, during the trial of this action.

Counsel to Defendant Sher, Thomas J. Nolan, testified that he had been told by others and Mr. Levine that Mr. Paul Johnson, Sher's trial attorney, had Defendant Sher ask Mr. Levine, on several occasions, to stretch his cross-examination of witnesses to the end of the trial day, so Mr. Johnson could start his cross-examination the next morning. Mr. Nolan was informed that Mr. Levine complied with the request and prolonged his cross-examination of witnesses to accommodate Mr. Johnson. (Transcript, pgs. 91–93).

At the hearing on the limited remand, Defendant Sher also testified. He stated that on at least ten different occasions, Mr. Johnson asked him to go to Mr. Levine and ask that he "stretch this to kill the afternoon." Mr. Sher said that Mr. Levine always complied with the requests of Mr. Johnson to extend his cross-examination until the end of the trial day. (Transcript, pgs. 116–117).

Disciplinary proceedings were instituted against Arnold Levine, Esquire, relating to certain of his conduct during and pertaining to the trial of Defendant McLain. The grievance was heard by a three judge district court panel. This three judge panel concluded that Mr. Levine had engaged in misconduct in violation of the Disciplinary Rules of the Code of Professional Responsibility, specifically DR 1–102(A)(4), (5), and

(6), and, that he should be publicly reprimanded for that violation. *In Re: Levine*, 675 F.Supp. 1312 (M.D.Fla.1986).

Given the foregoing, it seems that the Motion to Recuse is being filed just because the Defendant wanted it to be filed, irrespective of its lack of merit. The Defendant's motivation under the circumstances is undoubtedly that suggested at the outset of this order—delay and/or the hope of obtaining more favorable ruling from the Court as a result of the fact that the motion has been filed.

The Defendant presumably is asking the Court to disqualify itself pursuant to 28 U.S.C. § 455(a), since he has certainly raised no matters which fall within the ambit of 28 U.S.C. § 455(b). He has raised no matter whatsoever, of which this Court was not already aware, and has not introduced a single new fact to the Court. Had the matters discussed by the Defendant furnished a ground for recusal, the Court undoubtedly would have recused itself on its own initiative long ago. The law is very clear that when a frivolous request for recusal is filed, such as that of the Defendant here, it should be promptly and firmly denied. *Maier v. Orr*, 758 F.2d 1578, 1582–1583 (9th Cir.1985). The Court should take such action here.

The allegations in Point A of the Defendant's motion are not timely raised, and should have been raised by February 1, 1988, all apart from the other defects inherent in them discussed above. The tardiness also furnished a basis for rejecting them. See *Chitimacha Tribe of Louisiana v. Harry L. Laws Co.*, 690 F.2d 1157, 1164 n. 3 (5th Cir.1982).

The emphasis placed by the Defendant McLain on the appellate opinion herein in his motion for recusal is an effect caused by the way in which that opinion was structured. The Court has to ask what is the mission policy of the United States Courts and in what manner will that policy be implemented? What is the specific delineation of the mission policy which is applicable to the trial court and what are the parameters for the trial court's implementation of its delineated "mission policy?" In the same vein, what is the definable "mission policy" of the appellate courts and the parameters for implementation of that policy?

If trial judges are to decide properly, they need the power granted them by statute to organize their own assignments, along with the inherent power which is a vestige of their judicial office. *The Limited Power of the Federal Courts of Appeals, etc.*, 120 F.R.D. 267 (1988); (authored by the Honorable Jack B. Weinstein, Chief Judge, United States District Court, Eastern District of New York) states:

"Some panels of the federal courts of appeals have recently been ordering that a case on remand be heard by a different district court judge than the one who originally decided the case. This kind of order is a matter of concern because it represents an unjustified arrogation of power by some judges of the court of appeals and is destructive of the proper relationship between the trial and intermediate appellate courts.

"I have never been subject to such an order. My interest in the subject is as a Chief Judge concerned with the morale of trial judges and with the important joint work of the federal trial and appellate courts. To satisfactorily administer justice, we should have a sense of mutual respect and understanding among all judges as well as clear delineation of roles.

"The assumption of power by an appeals panel to control judge selection can only add to the burdens placed on the trial courts, while adversely and unnecessarily lowering their morale. The district courts have carefully designed plans for the division of business among their judges, and interference from above gums up the works. Trial courts operate every day, often with one judge hearing several motions and supervising more than one jury at a time. If trial judges are to decide properly, they need the power granted them by statute to organize their own assignments.

"One justification relied on by appeals panels ordering reassignment is that this is a power seldom used by the courts of appeals. That excuse hardly answers the argument that the power does not exist ...

"... Responsibility for discipline is placed in the circuit judicial councils and in the United States Judicial Conference, not in the courts of appeals. *See* 28 U.S.C. § 372(c).

"The constitutional choices made by the founding fathers show support for the concept of an independent judiciary in the United States, but they are inconclusive on the nature of that independence. Is an independent judge independent from his fellow judges or only from encroachment by the legislature and executive? Assertions in both directions exist. Because the boundaries of judicial independence have seldom needed clear delineation, the debate has been largely a rhetorical one. *See e.g.*, Rehnquist, *Political Battles for Judicial Independence*, 50 Wash.L.Rev. 835, 842 (1975) ('the unwritten constitutional law surrounding Article III' supports judicial independence 'even at the cost of enduring partisan judges'); ...

"... In the United States, the courts of appeals were established after many working years without them; no denigration of the general administrative power of the district courts to control themselves was accomplished by creation of the intermediate federal appellate system ...

"The Circuit Court of Appeals Act preserved the power of the federal courts to issue writs in aid of their jurisdiction. Ch. 517, s 6, 26 Stat. 826, 828, 829. The All Writs Act authorizes the modern use of mandamus and prohibition by the courts of appeals. *See* 28 U.S.C. § 1651. Proper use of this power requires an accurate sense of the boundaries of that jurisdiction: to review errors of law.

"Limited authority to control assignment of cases, administrative control of judges, or control over judicial conflict outside the boundaries of the rule of law in a particular case, exists only 1) in the district court sitting as a body, 2) to a limited degree in the judicial council of the circuit as provided by specific statute, 3) to a limited degree in the court of appeals as a body as provided by specific statute, 4) in the Judicial Conference of the United States as provided by statute, and 5) possibly in the Supreme Court as successor to the Court of Kings Bench. It does not exist in an appellate panel which is reviewing a specific case only for specific errors of law in the particular case by a particular federal judge.

"... A judge may be controlled by another judge, or panel, only under extraordinary and constrained conditions. In contrast, a judgment, a matter of law, is subject to an appellate court's decision to 'affirm, modify, vacate, set aside or reverse.' *See* 28 U.S.C. § 2106 ...

"... As will be pointed out below, there is little warrant for much of this action by appellate panels given the explicit power of the district courts, Circuit Councils and United States Judicial Conference to supervise ...

"It appears to be a violation of these statutory provisions for the court of appeals to reassign for bias if the district judge has not first passed on the matter. *See, e.g. United States v. Haldeman*, 559 F.2d 31, 131 & n. 287 (D.C.Cir.1976) ('involved judge has the prerogative, if indeed not the duty,' to decide bias question), *cert. denied*, 431 U.S. 933, 97 S.Ct. 2641, 53 L.Ed.2d 250 (1977); *Berger v. United States*, 255 U.S. 22, 36, 41 S.Ct. 230, 234, 65 L.Ed. 481 (1921) (challenged judge 'had a lawful right to pass upon the sufficiency of the affidavit' of bias). *Cf.* Stemple, *Rehnquist, Recusal and Reform*, 53 Brooklyn L.Rev. 589, 632–39 (1987) ...

"The recusal statutes instruct the judicial officer on the circumstances which require disqualification. *See* 28 U.S.C. § 455. A party who believes that the judge has not recused himself when he should have may file an affidavit stating the facts and the reasons for the belief that bias or prejudice exists. *See* 28 U.S.C. § 144. Both statutes suggest that the question of recusal lies initially in the district court's domain. They do not set forth bias as a ground for appellate review of the judgment; rather, they force the litigant to put the question of bias to the district judge and then appeal. *See United States v. Olander*, 584 F.2d 876, 883 (9th Cir.1978); *United States v. Mitchell*, 377 F.Supp. 1312 (D.D.C.1974), *aff'd*, 559 F.2d 31 (D.C.Cir.1976), *cert. de-*

*nied,* 431 U.S. 933, 97 S.Ct. 2641, 53 L.Ed. 2d 250 (1977) ...

"The limited scope of review afforded the court of appeals requires it to decide whether the judge abused his discretion by not recusing himself. *See, e.g., Johnson v. Trueblood,* 629 F.2d 287, 290 (3d Cir.1980), *cert. denied,* 450 U.S. 999, 101 S.Ct. 1704, 68 L.Ed.2d 200 (1981); *United States v. Haldeman,* 559 F.2d 31, 139 & n. 359 (D.C. Cir.1976), *cert. denied,* 431 U.S. 933, 97 S.Ct. 2641, 53 L.Ed.2d 250 (1977). On a motion for recusal, the standard for determining 'impartiality' is whether it might 'reasonably be questioned.' 28 U.S.C. § 455(a). One court recently articulated this standard as being 'whether an objective, disinterested observer fully informed of the facts underlying the grounds on which recusal is sought would entertain a significant doubt that justice would be done in the case.' *Pepsico, Inc. v. McMillen,* 764 F.2d 458, 460 (7th Cir.1985) (deciding request for mandamus). *See also United States v. Carmichael,* 726 F.2d 158 (4th Cir.1984); *United States v. Nelson,* 718 F.2d 315 (9th Cir.1983); *In re IBM,* 618 F.2d 923, 929 (2d Cir.1980) ('section sets up an objective standard for recusal, creating the so-called "appearance of justice" rule').

"The recusal statutes are not to be abused by parties making motions for tactical reasons which would result in wasted judicial resources. In *New York City Housing Development Corporation v. Hart,* 796 F.2d 976 (7th Cir.1986), the Seventh Circuit found a district court judge's recusal unwarranted by statute, declared the judge qualified to hear the case and left the question of his reassignment to the case in 'the sound discretion of the Executive Committee of the District Court.' *Id.* at 981. In *Hart,* the district court judge had originally denied the disqualification motion because he believed it had been made solely for tactical reasons. 796 F.2d at 978.

*Hart* emphasizes the importance of not transferring cases from one judge to another without good cause. As the appeals court noted, sanctioning a practice of 'ready recusal, coupled with a rule that requires the judge to whom the case is reassigned to revisit all of the rulings after the filing of a motion to disqualify, would multiply the work of judges who already have much to do.' 796 F.2d at 981. In *United States v. Murray,* 762 F.2d 1013 (Table) (6th Cir.1985) (unpublished opinion available on Westlaw), the court of appeals, affirming the denial of a recusal motion which challenged the judge who ruled on the suppression motion on the ground that he had earlier authorized the wiretap, stated: 'The frequent recusal of judges in such situations could lead to serious procedural headaches for the federal court system. Such a practice might even encourage an unjust form of judge-shopping.' *See also In re IBM Corporation,* 618 F.2d 923, 934 (2d Cir.1980) (refusing to order disqualification because it 'would result in the waste ... [of] the past decade ... of judicial time and energy....')

"A busy district court cannot accept unwarranted recusals or changes in judges' assignments; they place extra burdens on the other judges and waste scarce judicial resources. 'The district judge is, of course, obligated to recuse himself without reason just as he is obligated not to recuse himself when there is no reason.' *Suson v. Zenith Radio Corporation,* 763 F.2d 304, 308–09 n. 2 (7th Cir.1985) ...

> (1) whether the original judge would reasonably be expected upon remand to have substantial difficulty in putting out of his or her mind previously-expressed views or findings determined to be erroneous or based on evidence that must be rejected, (2) whether reassignment is advisable to preserve the appearance of justice, and (3) whether reassignment would entail waste and duplication out of proportion to any gain in preserving the appearance of fairness.... 120 F.R.D. at 267, 272, 273, 275, 276, 277, 279, 280, 281, and 282."

The *McLain* opinion recites the appellate court's cognizance of the maxim that a trial judge has broad discretion in conducting a trial. The Court must agree with the Government's response that the appellate court's opinion, regrettably, reflected a disparity between the reality of the trial and conclusions set forth in the opinion. Whether or not the appellate court was

merely "result oriented", as the Government alleges, the opinion serves and invites "judge shopping". The judicial systems of this country already face too much "judge shopping." (See comments of Retired Chief Justice Warren Burger, *The Third Branch*, Vol. 20, No. 9, pg. 10, Sept. 1988).

As a direct result of the manner in which the appellate court elected to write the opinion, this Court has been subjected to public vilification. The opinion made no allegations of bias or prejudice on the part of the Court, no "first person" comment of improper conduct by this Court. The opinion found that this Court was motivated by acceptable motives, the motive of minimizing delay and confusion, but found the results, as discerned from a cold record, to have been an impediment to Defendant's right to a fair trial.

The opinion opened the door to rampant, if not necessarily truthful or supportable, criticism of this Court. The Court was subjected to careless news reporting of the opinion; one news story reported that the "*judge* was dozing" in the courtroom, rather than accurately reporting that there were complaints of a *juror* sleeping during the proceedings.

The question this Court has to address is whether the appellate court's opinion in some way requires the Court to recuse itself. Recusal statutes are not to be abused by parties making motions for tactical reasons, which recusal would result in wasted judicial resources. "A busy district court cannot accept unwarranted recusals or changes in judges' assignment; they place extra burdens on the other judges and waste judicial resources." A judge is not obligated to recuse herself without reason. *Supra*, 120 F.R.D. at 267–268.

The Court finds that Defendant is attempting to create "bias" as a basis for recusal by his reliance on the *McLain* opinion as a purported reason requiring recusal. The Court cannot find the mere fact that the appellate court reversed this Court, in an opinion Defendant asserts to have "severely criticized" it, as a valid basis for recusal. Accordingly, it is OR-

DERED that the motion to recuse be denied.

DONE and ORDERED.