DISTRICT COURT OF APPEAL OF THE STATE OF FLORIDA
FOURTH DISTRICT
*July Term 2014*

**EDDIE VINCENT RUTLEDGE,**
Appellant,

v.

**STATE OF FLORIDA,**
Appellee.

No. 4D10-5022

[October 29, 2014]

Appeal from the Circuit Court for the Fifteenth Judicial Circuit, Palm Beach County; Stephen A. Rapp, Judge; L.T. Case No. 502008CF000919AXXMB.

Jacob M. Noble of Noble Law, Palm Beach Gardens, for appellant.

Pamela Jo Bondi, Attorney General, Tallahassee, and Richard Valuntas, Assistant Attorney General, West Palm Beach, for appellee.

CIKLIN, J.

The appellant, Eddie Rutledge, timely appeals his convictions and sentences for first-degree murder and conspiracy to commit murder. Within a reasonable period of time of becoming aware of it, Rutledge's court appointed attorney, Carey Haughwout, put the trial court on notice that she suspected the State Attorney's Office was investigating her for witness tampering. The court erred when it denied Haughwout's request that it conduct an inquiry into the potential conflict and the record does not indicate that Rutledge executed a waiver. Because Rutledge's Sixth Amendment right to counsel was violated, we have little choice but to reverse and remand for a new trial.

Rutledge argues that his right to the assistance of an attorney was violated when Haughwout continued to represent him despite the fact that she was being investigated by the state for witness tampering in connection with the prosecution of Rutledge. Rutledge frames the error in two ways. First, he claims the court erred in failing to conduct a hearing or some type of meaningful inquiry on the potential ethical

conflict and secondly argues ineffective assistance of counsel occurred as a result of Haughwout's failure to withdraw.

Facts

Rutledge and Kenakil Gibson ("co-defendant") were indicted for capital murder with a firearm (count I), conspiracy to commit first-degree murder (count II), and solicitation to commit first-degree murder (count III).

The state alleged that Rutledge and the co-defendant killed the victim, George Mannerino, on the day before the victim was scheduled to testify against them in an unrelated burglary trial. According to the state, Mannerino witnessed Rutledge and the co-defendant attempt to break into and commit a burglary in the Palm Beach Gardens home of Mannerino's neighbor. Because of Mannerino's decision to become involved and report the criminal act, Rutledge and the co-defendant were investigated by law enforcement officials, which ultimately led to both being charged with burglary. The day before Mannerino was set to testify in the burglary trial, he was shot dead in front of his house by someone traveling in a car.

The state additionally alleged that shortly after the murder of Mr. Mannerino, Rutledge made an unexpected visit to his longtime acquaintance, Dr. Paul Inkeles, and attempted to persuade Inkeles to provide a false alibi for him. Rutledge allegedly gave Inkeles several hundred dollars' worth of heroin, which Inkeles believed was offered to induce his false testimony. When law enforcement officials initially interviewed Inkeles, he said Rutledge was with him at the time of the victim's murder although he later recanted that version of events. At the point in time leading to Rutledge's trial, Inkeles had a pending case in Broward County for DUI manslaughter and vehicular homicide.

During the pre-trial period, the state subpoenaed attorney Steven Swickle, who represented Inkeles in the Broward County DUI prosecution. Swickle moved to quash the subpoena and his motion was taken up in an August 24, 2010 pretrial hearing related to Rutledge's case. During the hearing on the motion to quash, the Rutledge prosecutor, Andrew Slater, explained to the court that he wanted to ask Swickle "about conversations that he had with somebody besides his client." Slater stated that the subpoena was an "investigative" subpoena related to "potential criminal charges separate and apart from those facing [Rutledge]." It was at this juncture that Haughwout announced it was her understanding from Slater's statements that "apparently they're investigating me and whether I intimidated a witness . . . , so if we're

2

going down these roads, you know, I'd say tread carefully . . . ." The trial court denied Swickle's motion to quash the subpoena.

Two days later on August 26, Haughwout then filed her own motion to quash the state's subpoena of attorney Swickle, which alleged the following. Inkeles was represented by Swickle on the unrelated Broward DUI charge. Haughwout spoke to Inkeles with Swickle's permission and, after Haughwout's conversation with Inkeles, the state subpoenaed attorney Swickle without notice to Haughwout. Based on Slater's statements at the August 24th hearing on Swickle's motion to quash, Haughwout believed the state sought to discover the contents of her conversation with Inkeles, which she argued in her motion to quash, was protected by work product. The trial court summarily denied Haughwout's motion to quash, without comment.

On August 31, 2010, Haughwout further moved to disqualify the State Attorney's Office or alternatively exclude Inkeles as a state witness in the prosecution of Rutledge. Haughwout also filed a motion captioned, "Motion to Disclose Alleged Criminal Investigation" in which Haughwout put the court on notice that a conflict of interest between Haughwout and her client, Rutledge, might have been created based on the state's apparent investigation into Haughwout's contact with Dr. Inkeles. In her motion, Haughwout explained that she had obtained a transcript of an apparent investigative statement Inkeles gave in response to an "inquir[y] into [Haughwout's] efforts on behalf of [Rutledge]." Haughwout expressed uncertainty as to whether the state was in fact investigating her, and she stated that "[Rutledge] believe[d] this investigation [was] a ruse, conducted in order to interfere in his right to counsel," but "he [was] entitled to know whether in fact there is or was such an investigation and the details of said investigation."

The state filed a response to the motions filed by Haughwout. According to the state, Haughwout told attorney Swickle that she would cross-examine Inkeles about his pending DUI manslaughter if Inkeles took the stand in the state's prosecution against Rutledge. Swickle then, according to the state, told Slater his client would therefore exercise his right not to testify. According to Slater, the state had become aware of "serious and credible allegations that [Haughwout] engaged in misconduct by threat or intimidation toward state witness . . . Inkeles," and it had a "good faith basis for investigating these allegations, [which were] directly brought to [the state's] attention by attorney Swickle, strongly suggesting potential misconduct by defense counsel with a material State witness in a capital case."

3

As to the defense motion to disqualify the State Attorney's Office in its prosecution of Rutledge, the state argued that disqualification was not necessary, as it had withdrawn its subpoena and suspended its investigation of Haughwout. The state conceded, however, that if the investigation was reinstated at some point, another Florida state attorney's office should assume control of the matter, because of the "institutional and ongoing relationship between the [15th Judicial Circuit's] Public Defender's Office and the State Attorney's Office."

On the morning of jury selection at Rutledge's September 1st trial, Haughwout reminded the court about the pending motions to disqualify the state and to require the state to disclose whether it was conducting a criminal investigation against Haughwout:

> MS. HAUGHWOUT: Okay. And, Judge, I just -- there are some other matters. We have filed a motion to disqualify the State attorney's office and requested an evidentiary hearing based on that. We have also filed a motion to disclose the details of the State's allegation of criminal activity and essentially that is Mr. Rutledge's right to know if the Court remembers last week that the State was in here on a subpoena saying they were conducting an independent criminal investigation of somebody else and essentially what we've learned -- and I'm not going to argue the motion, the details at this point -- is that that investigation involves me, and it is our position that Mr. Rutledge is entitled to the details of that investigation to determine whether there is a conflict in our representation of him given -- it is the same prosecuting authority that is prosecuting him as is engaged in a supposed criminal investigation of his lawyer, so.
>
> THE COURT: Does this have to do with Dr. Inkeles?
>
> MS. HAUGHWOUT: Yes

4

THE COURT: Well, your motions are denied on that without any evidentiary hearing. We don't need an evidentiary hearing, I've read the motion so they're denied. What's next?

* * *

MS. HAUGHWOUT: And this morning we filed a motion to disclose the details of this alleged investigation, and the law is pretty clear that it can constitute a conflict of interest for a person accused of a crime to have a lawyer who is under investigation.

THE COURT: I don't think anybody has accused you of a crime.

MS. HAUGHWOUT: In fact, that is exactly what has occurred, and that is what was alleged by the State last week in the motion, and we have the transcript of that where we allege they were investigating a separate criminal investigation, and that as I learned and then as we saw from the interview with [Dr.] Inkeles, it clearly relates to me and my questioning of Dr. Inkeles. The State's response that they filed this morning makes that abundantly clear that that is the investigation.

THE COURT: Look, look, look, it is commonplace for lawyers to ask witnesses, did you talk with the other attorney, the State attorney? Yes. What did you say to him? What did he say to you; that's usually the Defense during that questioning. Nobody says there's a conflict of interest that somebody violated the law, and that sort of happened here in reverse when this witness sort of changed his mind, decided he wasn't going to talk,

5

through the advice of his lawyer, so that we're making a problem out of a little mole hill.

The trial proceeded unabatedly and the jury eventually returned guilty verdicts on the charges of first-degree murder and conspiracy to commit murder and not guilty of solicitation to commit first-degree murder.

Rutledge appeals, arguing a violation of his Sixth Amendment Right to Counsel. He asserts that upon Haughwout's notification and request for hearing, the trial court was required to permit an inquiry to determine whether a conflict of interest existed. We agree.

## Analysis

*Guiding Principles*

In *Lee v. State*, 690 So. 2d 664 (Fla. 1st DCA 1997), the First District set forth the guiding principles governing pretrial disclosures of potential conflicts of interest:

> Implicit in the Sixth Amendment right to counsel is the right to the effective assistance of counsel. *Strickland v. Washington*, 466 U.S. 668, 686, 104 S. Ct. 2052, 2063-64, 80 L. Ed. 2d 674 (1984). An actual conflict of interest can impair the performance of a lawyer and ultimately result in a finding that the defendant did not receive the effective assistance of counsel. *Cuyler v. Sullivan*, 446 U.S. 335, 345, 100 S. Ct. 1708, 1717, 64 L. Ed. 2d 333 (1980); *see also Holloway v. Arkansas*, 435 U.S. 475, 481, 98 S. Ct. 1173, 1177, 55 L. Ed. 2d 426, 434 (1978). When defense counsel makes a pretrial disclosure of a possible conflict of interest with the defendant, the trial court must either conduct an inquiry to determine whether the asserted conflict of interest will impair the defendant's right to the effective assistance of counsel or appoint separate counsel.

*Id.* at 667.

*Waiver by Defendant of Potential Conflict*

A defendant's fundamental right to conflict-free counsel can be waived:

6

A defendant may waive this right by choosing to proceed to trial with an attorney who has an adverse conflict of interest. *United States v. Garcia,* 517 F.2d 272, 276 (5th Cir. 1975). "Thus, even though the right to competent counsel is 'fundamental,' [footnote omitted], it may nonetheless be waived." *Id.* A determination that defendants have waived the right to conflict-free counsel disposes of the need to evaluate the actual or potential ineffectiveness of counsel caused by the alleged conflicts of interest. *Id.* at 277. "The determination of whether there has been an intelligent waiver of right to counsel must depend, in each case, upon the particular facts and circumstances surrounding the case, including the background, experience, and conduct of the accused." *Id.* at 277 n. 5, quoting *Johnson v. Zerbst,* 304 U.S. 458, 464, 58 S. Ct. 1019, 1023, 82 L. Ed. 1461, 1466 (1938).

A defendant's waiver must be established by "'clear, unequivocal, and unambiguous language.'" *Id.* at 278. The record should show, in some way, that the defendant was aware of the conflict of interest; realized the conflict could affect the defense; and knew of the right to obtain other counsel. *See United States v. Petz,* 764 F.2d 1390, 1393–94 (11th Cir. 1985); *Garcia,* 517 F.2d at 278 (describing procedure to obtain waiver). Although the court should try to elicit narrative replies, "[m]ere assent in response to a series of questions from the bench" may in some cases constitute adequate waiver. *Id.*

*U.S. v. Rodriguez,* 982 F.2d 474, 477 (11th Cir. 1993).

The record before us clearly indicates that there was no waiver by Rutledge in any manner. He was not questioned by anyone in the courtroom nor given any opportunity to consider his options. Other than the same rumor his attorney, Ms. Haughwout, apparently heard, the cold record establishes that Rutledge was not provided with the pertinent information to which he was fundamentally entitled. It is axiomatic that Rutledge could not make an informed decision on the issue of waiver without first receiving relevant details and being otherwise informed.

*Harmless Error*

The state urges us to apply a harmless error analysis; something which we simply are unable to do. If an allegation of potential conflict is made, a hearing or some type of questioning or discussion is mandatory.

7

If the trial court fails to make the inquiry or other equivalent probe, an appellate court's harmless error analysis would be virtually impossible to perform because "'any action the lawyer refrained from taking because of the conflict would not be apparent from the record.'" *Hannah v. State*, 42 So. 3d 951, 955 (Fla. 4th DCA 2010) (quoting *Thomas v. State*, 785 So. 2d 626, 629 (Fla. 2d DCA 2001)). *See also Lee*, 690 So. 2d at 669 (recognizing that where there is an alleged conflict of interest between a lawyer and client, trial court's inadequate inquiry cannot be treated as harmless error). With respect to certain types of ethical conflicts, the United States Supreme Court has opined that "reversal is automatic":

> [T]he assistance of counsel is among those "constitutional rights so basic to a fair trial that their infraction can never be treated as harmless error." *Chapman v. California*, [386 U.S. 18, 23 (1967)]. Accordingly, when a defendant is deprived of the presence and assistance of his attorney, either throughout the prosecution or during a critical stage in, at least, the prosecution of a capital offense, reversal is automatic. *Gideon v. Wainwright*, 372 U.S. 335, 83 S. Ct. 792, 9 L. Ed.2d 799 (1963); *Hamilton v. Alabama*, 368 U.S. 52, 82 S. Ct. 157, 7 L. Ed.2d 114 (1961); *White v. Maryland*, 373 U.S. 59, 83 S. Ct. 1050, 10 L. Ed.2d 193 (1963).

*Holloway*, 435 U.S. at 489.

### Possible Manifestations of Ethical Conflicts

It is certainly not our intent to overstate the potential consequences of a failure to act in situations such as the one before us. Nonetheless, there is a fairly significant number of viable scenarios which underscore the urgency of the matter and cry out the need for trial courts to take substantive action when this type of potential conflict is brought to the trial court's attention. In *United States v. McLain*, 823 F.2d 1457 (11th Cir. 1987), *overruled on other grounds as recognized in U.S. v. Watson*, 866 F.2d 381, 385 n.3 (11th Cir. 1989), the Eleventh Circuit, in a somewhat similar fact pattern, mused about the competency of a defense lawyer's representation of his or her client when faced with their own criminal prosecution:

> Although [defense lawyer] Johnson testified that he was not worried about the investigation, his client, having hired Johnson for his sterling reputation would have reacted differently. Furthermore, the increased intensity of the government's investigation of Johnson's records should have convinced him of the seriousness of his situation and the

conflict between his desires to aide his client and save himself.

*Id.* at 1464. Even though *McLain* found a *presumptive actual conflict* and while it can be fairly argued that the ramifications of similar hypothetical scenarios are remote, trial courts must intercede. Appellate tribunals must necessarily rely on the trial court to flesh out the details of potential ethical conflicts between counsel and their clients and thus an inquiry is mandatory. The sanctity of the Sixth Amendment depends upon it.

Haughwout put the trial court on notice that it appeared she was being investigated by the state for attempting to intimidate or otherwise tamper with a state witness in the state's prosecution of Rutledge. Clearly, this was sufficient to trigger an immediate alarm on the part of everyone in the courtroom and the certain need for a meaningful on-the-record discussion. Unfortunately, the court essentially disregarded the matter, finding, without any substantive inquiry, that Haughwout was making a "problem out of a little mole hill."

The *McLain* court partially relied upon and therefore quoted a most basic tenet of the Model Code: "[A] lawyer should not accept proffered employment if his personal interests or desires will, or *there is a reasonable possibility* that they will, affect adversely the advice to be given or services to be rendered the prospective client." *Id.* at 1463 (emphasis in original) (quoting MODEL CODE of PROF'L RESPONSIBILITY EC 5-2 (1987)).

The professional responsibilities of attorneys licensed by the Florida Bar are similarly stringent under the Rules Regulating the Florida Bar. While the rules do not directly address the situation at issue here, the comment to Rule 4-1.7, which governs conflicts of interest involving current clients, provides pertinent language which bears repeating:

> Loyalty and independent judgment are essential elements in the lawyer's relationship to a client. Conflicts of interest can arise from the lawyer's responsibilities to another client, a former client or a third person, or from the lawyer's own interests.

R. Regulating Fla. Bar 4-1.7 (2014).

Before us on appeal, the state urges that there was no evidence of an *actual* conflict, suggesting that because it had "suspended" the criminal investigation of Haughwout, any potential ethical conflict between

9

Haughwout and her client was thereby summarily extinguished. Apparently envisioning the possibility of renewing the Haughwout investigation, however, the state suggested that if the investigation was recommenced, the matter would necessarily be transferred to a different prosecutor's office within the state.

Conclusion

Whether the investigation was suspended or not and whether a renewal of such an investigation was possible or not and whether an *actual* conflict existed or not, the proceedings below should have taken a detour. Once Haughwout's ethical responsibilities as to her representation of Rutledge were called into question, the trial court was required to take affirmative action to ferret out the facts underlying the potential conflict. And, of course, it matters not if the state attorney or even the defense attorney herself believed no (perceived or actual) conflict of interest existed. *See Forsett v. State*, 790 So. 2d 474, 474-75 (Fla. 2d DCA 2001) (granting new trial where defense counsel informed court he had represented a state witness but opined he did not believe it created a conflict of interest, and trial court did not conduct inquiry or obtain a waiver from defendant).

At the risk of being redundant, we once again emphatically state that when a pretrial disclosure of a possible conflict of interest is raised, "the trial court must either conduct an inquiry to determine whether the asserted conflict of interest will impair the defendant's [Sixth Amendment right] or appoint separate counsel." *Lee*, 690 So. 2d at 667 (citing *Holloway*, 435 U.S. at 484).

The remainder of claims raised by Rutledge are without merit and we thus decline further comment.

*Reversed and remanded for a new trial.*

STEVENSON and FORST, JJ., concur.

\* \* \*

**Not final until disposition of timely filed motion for rehearing.**